ESTATE OF SPIEGEL ET AL. *v.* COMMISSIONER
OF INTERNAL REVENUE.

No. 3.   Argued October 24, 1947.—Reargued October 11–12, 1948.—
Decided January 17, 1949.

*Herbert A. Friedlich* argued the cause for petitioners. With him on the briefs were *Leo F. Tierney, Harry Thom* and *Louis A. Kohn. Joseph M. Weil* was also on the brief on the reargument.

*Arnold Raum* argued the cause for respondent. With him on the briefs were *Solicitor General Perlman, Assistant Attorney General Caudle, Lee A. Jackson* and *L. W. Post. Helen R. Carloss* was also on the brief on the original argument, and *Ellis N. Slack* was also on the brief on the reargument.

MR. JUSTICE BLACK delivered the opinion of the Court.

This is a federal estate tax controversy. Here, as in *Commissioner* v. *Church, ante,* p. 632, we granted certiorari to consider questions dependent upon the meaning and application of a provision of § 811 (c) of the Internal Revenue Code. 47 Stat. 169, 279, as amended, 26 U. S. C. § 811 (c). The particular provision requires including in a decedent's gross estate the value at his death of all property "To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise . . . intended to take effect in possession or enjoyment at or after his death . . . ."

In 1920 Sidney M. Spiegel, a resident of Illinois, made a transfer by trust of certain stocks to himself and another. He died in 1940. During his life the trust income was to be divided among his three children; if they did not survive him, to any of their surviving children. On his death the trust provided that the corpus was to be distributed in the same manner. But no provision was made for distribution of the corpus and its accumulated income should Mr. Spiegel survive all of his children and grandchildren. For this reason the Government has contended that under controlling state law the property would have reverted to Mr. Spiegel had he survived his designated beneficiaries.

The value of the corpus of this trust was not included in the Spiegel estate tax return. The Commissioner concluded that its value with accumulated income, about $1,140,000, should have been included in the gross estate under § 811 (c). The Tax Court held otherwise in an unreported opinion. The Court of Appeals for the Seventh Circuit reversed. 159 F. 2d 257. It held that the possession or enjoyment provision of § 811 (c) required inclusion of the value of the trust property and accumulated income under the rule declared in *Helvering* v. *Hallock,* 309 U. S. 106, because under state law the trust

agreement left the way open for the property to revert to Mr. Spiegel in case he outlived all the beneficiaries. This holding rested on the agreement of parties that whether there was a right of reverter depended on Illinois law, and the court's conclusion that under Illinois law a right of reverter did exist.[1]

The *Hallock* case on which the Court of Appeals relied held that the value of trust properties should have been included in a settlor's gross estate under the "possession or enjoyment" provision where trust agreements had expressly provided that the corpus should revert to the settlor in the event he outlived the beneficiaries. The taxpayer has contended here, as in the Tax Court and the Court of Appeals, that the *Hallock* rule is not applicable to this trust, where the settlor's chance to get back his property depended on state law and not on an express reservation by the settlor. This contention of the taxpayer rests in part on the argument that § 811 (c) imposes a tax only where it can be shown that the settlor's intent was to reserve for himself a contingent reversionary interest in the property. Another contention is that the value of this contingent reversionary interest was so small in comparison with the total value of the corpus that the *Hallock* rule should not be applied. A third contention is that the Court of Appeals holding was erroneous in that under Illinois law the corpus of this trust would not have reverted to the settlor had all the beneficiaries died while the settlor was still living. Petitioners urge that in that event the Illinois courts would have held that the corpus passed to the heirs of the last surviving beneficiary.

---

[1] This Court of Appeals interpretation and application of § 811 (c) was in conflict with the holding of the Third Circuit in *Commissioner of Internal Revenue* v. *Church's Estate*, 161 F. 2d 11. We granted certiorari in both cases, arguments have been heard together, and we have today reversed the *Church* case, *ante*, p. 632.

We hold that the *Hallock* rule was rightly applied by the Court of Appeals and we accept its holding as to the applicable Illinois law.

*First.* In *Commissioner* v. *Church, ante,* p. 632, we have discussed the *Hallock* holding in relation to the scope of the "possession or enjoyment" provision of § 811 (c) and need not elaborate what we said there. What we said demonstrates that the taxability of a trust corpus under this provision of § 811 (c) does not hinge on a settlor's motives, but depends on the nature and operative effect of the trust transfer. In the *Church* case we stated that a trust transaction cannot be held to alienate all of a settlor's "possession or enjoyment" under § 811 (c) unless it effects "a bona fide transfer in which the settlor, absolutely, unequivocally, irrevocably, and without possible reservations, parts with all of his title and all of his possession and all of his enjoyment of the transferred property. After such a transfer has been made, the settlor must be left with no present legal title in the property, no possible reversionary interest in that title, and no right to possess or to enjoy the property then or thereafter. In other words such a transfer must be immediate and out and out, and must be unaffected by whether the grantor lives or dies." We add to that statement, if it can be conceived of as an addition, that it is immaterial whether such a present or future interest, absolute or contingent, remains in the grantor because he deliberately reserves it or because, without considering the consequences, he conveys away less than all of his property ownership and attributes, present or prospective. In either event the settlor has not parted with all of his presently existing or future contingent interests in the property transferred. He has therefore not made that "complete" kind of trust transfer that § 811 (c) commands as a prerequisite to a showing that he has certainly and irrevocably parted with his "possession or enjoyment." Any requirement

706

less than that which we have outlined, such as a post-death attempt to probe the settlor's thoughts in regard to the transfer, would partially impair the effectiveness of the "possession or enjoyment" provision as an instrument to frustrate estate tax evasions. To this extent it would defeat the precise purpose for which the provision was originated and which prompted Congress to include it in § 811 (c).

Determination of such issues as ownership, possession, enjoyment, whether transfers have been made and the reach of those transfers, may involve many questions of fact. And we have held in many cases that to the extent the determination of such issues depends upon fact finding, many different facts may be relevant. These fact issues in federal tax cases are for the Tax Court to decide in cases brought before it.

In this case the Tax Court made findings of fact and then decided against the Government. It did so, however, by holding as a matter of law that those facts did not require inclusion of the value of this corpus in the settlor's estate.[2] But the Tax Court's findings of fact showed that the trust contained no provision for disposition of the corpus should the settlor outlive the beneficiaries. This finding of fact, which we accept, plus the Court of Appeals determination of controlling Illinois law,

---

[2] The Tax Court's conclusion of law that the "possession or enjoyment" clause of § 811 (c) was inapplicable to the facts of this trust rested in part on its belief that *Reinecke* v. *Northern Trust Co.*, 278 U. S. 339, had decided the issue. But the *Hallock* case was decided after *Reinecke*, and the question here involved was not specifically raised in the *Reinecke* case. Nor did the Court's opinion in that case, written by the late Chief Justice Stone, indicate that a transfer of bare legal title in a transfer must always be accepted as a conclusive showing that the possession and enjoyment provision of § 811 (c) cannot be applied to the trust corpus. *Cf.* Court's opinion in *Harrison* v. *Schaffner*, 312 U. S. 579, written by Chief Justice Stone.

without more, brings this trust transaction within the scope of the possession or enjoyment provision of § 811(c) as we have interpreted that section in the *Hallock* and *Church* cases. And petitioner has not contended that it was denied an opportunity to present any relevant evidence concerning ownership, possession, or enjoyment. It is therefore not necessary to remand the case to the Tax Court for any further finding of facts. See *Hormel* v. *Helvering,* 312 U. S. 552, 559–560.

*Second.* It is contended that since the monetary value of the settlor's contingent reversionary interest is small in comparison with the total value of the corpus, the possession or enjoyment provision of § 811 (c) should not be applied. But inclusion of a trust corpus under that provision is not dependent upon the value of the reversionary interest. *Fidelity-Philadelphia Trust Co.* v. *Rothensies,* 324 U. S. 108, 112; *Commissioner* v. *Estate of Field,* 324 U. S. 113, 116; see *Goldstone* v. *United States,* 325 U. S. 687, 691. The question is not how much is the value of a reservation, but whether after a trust transfer, considered by Congress to be a potentially dangerous tax evasion transaction, some present or contingent right or interest in the property still remains in the settlor so that full and complete title, possession or enjoyment does not absolutely pass to the beneficiaries until at or after the settlor's death. See *Smith* v. *Shaughnessy,* 318 U. S. 176, 181.

*Third.* It is contended that under Illinois law the corpus of this trust would not have reverted to the settlor had he outlived the beneficiaries. The record reveals that the state law problem here is not an easy one, but under this Court's decision in *Meredith* v. *Winter Haven,* 320 U. S. 228, the difficulty involved did not relieve the Court of Appeals of its duty to make a decision. The questioned ruling was made by three judges who are constantly required to pass upon Illinois law questions. One

of the three judges has long been a resident and lawyer of Illinois. Examination of the Illinois state court opinions pressed upon us leaves us unable to say with any degree of certainty that the Court of Appeals holding was wrong. It is certainly neither novel nor unreasonable for state law to provide that when all trust beneficiaries die the trust corpus should revert to the donor. It would be wholly unprofitable for us to analyze Illinois cases on the point here urged. It is sufficient for us to say that we think reasonable arguments can be made based on Illinois cases to support a determination of this question either for or against the petitioner's contention. Under these circumstances we will follow our general policy and leave undisturbed this Court of Appeals holding on a question of state law.[3]

All other arguments of the petitioners have been noted and we find them without merit.

*Affirmed.*

MR. JUSTICE JACKSON dissents.

[For opinion of MR. JUSTICE REED, concurring in this decision but dissenting from that in *Commissioner* v. *Estate of Church, ante,* p. 632, see *ante,* p. 651.]

[For opinion of MR. JUSTICE FRANKFURTER, dissenting from this decision and also that in *Commissioner* v. *Estate of Church, ante,* p. 632, see *ante,* p. 667.]

MR. JUSTICE BURTON, dissenting.

Today's decision adds to the difficulties in this troubled field of estate tax law. It may, however, serve a good purpose if it leads to a simultaneous consideration by

---

[3] *Helvering* v. *Stuart,* 317 U. S. 154, 162–165; *cf. Steele* v. *General Mills,* 329 U. S. 433.

Congress of the related fields of income, gift and estate taxation in connection with the creation or transfer of future interests.

## FIVE ALTERNATIVES.

At least five alternative proposals have been presented to us for the solution of this case. The *first* calls for the reversal of *Reinecke* v. *Northern Trust Co.,* 278 U. S. 339, and a decision against the taxpayers. The *second* calls for the extension to this case of the doctrine of *Helvering* v. *Clifford,* 309 U. S. 331, and a remand to determine further facts. The *third, fourth* and *fifth* follow existing precedents more closely. Each recognizes that, if no possibility of a reverter [1] arose in favor of the settlor, by operation of law, under the trust instrument before us, the property thereby placed in trust is not required by § 811 (c) of the Internal Revenue Code to be included in the gross estate of the settlor for federal estate tax purposes. The *third* proposal finds that the law to be applied, for the above purpose, is that of Illinois. It calls for a decision in favor of the taxpayers because, under a correct application of that law, the required

---

[1] The terms "reverter" and "the possibility of a reverter" have been used frequently and freely in opinions and discussions of this general subject. They are used here to refer to the return or possible return to the settlor or to his estate, under conditions comparable to those here suggested, of property previously placed in trust by the settlor. They are not used in any strict or technical sense peculiar to the law of property. See also, I Paul, Federal Estate and Gift Taxation § 7.21, n. 1 (1942). They may refer, for example, to a reversionary interest, or a beneficial interest under a resulting trust, or merely some right to or control over a beneficial interest in the trust property and, in that sense, they include the "string or tie" to the trust property that also has been referred to frequently in discussions of this subject. The term "reversion" is used in its usual technical meaning in the law of property.

reverter could not arise. The *fourth* proposal claims or assumes that a possibility of a reverter did arise under this trust by operation of the law of Illinois in favor of the settlor. It, however, declines to apply the rule of *de minimis non curat lex* and, by declining to look further, it reaches a decision against the taxpayers. This is the alternative which has been adopted in the opinion of the Court. The *fifth* proposal is like the fourth except that it does look further and it recognizes that § 811 (c) requires a finding of the settlor's actual intent in order to make that Section applicable. It then concludes that in the instant case the required intent is absent. The fifth proposal, therefore, calls for a decision in favor of the taxpayers or at least calls for a remand to determine the existence, if any, of the settlor's required intent. I believe that only the third and fifth proposals present a sound solution. Each of those two is founded upon existing precedents, reaches an equitable result and contributes to the certainty rather than to the uncertainty of the application of the tax, pending legislative reconsideration of the entire subject. I prefer the fifth because it avoids complete dependence upon the law of a state. If the fifth proposal is not accepted, I believe that the present status of the law of Illinois requires acceptance of the third.

I. The First Proposal Is That the Reinecke Case Be Overruled.

The lack of judicial support for overruling *Reinecke* v. *Northern Trust Co., supra,* at this late day, makes it unnecessary to consider this proposal at length. It has been, however, strongly urged upon us. The Spiegel trust instrument is so simple and complete in its terms [2] that to apply the federal estate tax to its corpus merely on the strength of those terms would require a reversal

---

[2] The Spiegel trust instrument is set forth in full in Appendix I, *infra*, p. 735.

of the *Reinecke* case. Accordingly, on the reargument of this case, we asked the following question:

"1. Assuming that, under the applicable state law, there was no possibility of reverter and no interest of any other kind retained or arising in favor of the settlor or his estate under the transfer made in trust, *inter vivos,* did section 811 (c) of the Internal Revenue Code require that the value of the corpus of the trust be included in the settlor's gross estate for federal estate-tax purposes? That is, did section 811 (c) require the inclusion in the gross estate of the settlor of the value of the corpus of a trust, created *inter vivos,* merely because the settlor had provided in it that, upon his death, the trust should terminate and the corpus be distributed to designated beneficiaries then surviving?" Journal Supreme Court, Oct. Term, 1947, pp. 296–297.

In response, counsel for the Commissioner argued in the affirmative and counsel for the petitioners in the negative. The interpretation of the statute urged on behalf of the Commissioner, however, had been long ago rejected unanimously by this Court in passing upon the so-called "five trusts" in the *Reinecke* case. Accordingly, if that precedent stands, the answer to the above question remains "No" and that issue should be at rest.

The reasoning of the *Reinecke* case requires that, for a transfer to be taxable in a case like this, the settlor must have intended that the transfer come *from the settlor* and that it take effect in possession or enjoyment at or after the settlor's death. It must be from the dead to the living. That requirement calls for the existence of an interest, right or control in the settlor, or at least the existence of some possibility of a reverter to the settlor or to his estate, amounting to a string or tie to the trust property, in order to make § 811 (c) applicable. Such interest, string or tie must also be one that was

transferred, cut off or obliterated by the terms of the trust at or after the death of the settlor.

Accordingly, there now should be said about § 811 of the Internal Revenue Code, 53 Stat. 120, 26 U. S. C. (1940 ed.) § 811, what Mr. Justice Stone, in 1929, said in the *Reinecke* case about the corresponding § 402 of the Revenue Act of 1921, c. 136, 42 Stat. 227, 278:

> "In its plan and scope the tax is one imposed on transfers at death or made in contemplation of death and is measured by the value at death of the interest which is transferred. Cf. *Y. M. C. A.* v. *Davis,* 264 U. S. 47, 50; *Edwards* v. *Slocum,* 264 U. S. 61, 62; *N. Y. Trust Co.* v. *Eisner,* 256 U. S. 345, 349. It is not a gift tax, and the tax on gifts once imposed by the Revenue Act of 1924, c. 234, 43 Stat. 313, has been repealed, 44 Stat. 126. One may freely give his property to another by absolute gift without subjecting himself or his estate to a tax, but we are asked to say that this statute means that he may not make a gift *inter vivos,* equally absolute and complete, without subjecting it to a tax if the gift takes the form of a life estate in one with remainder over to another at or after the donor's death. It would require plain and compelling language to justify so incongruous a result and we think it is wanting in the present statute." *Id.* at pp. 347–348.

See also, *Helvering* v. *Hallock,* 309 U. S. 106; dissenting opinion in *Becker* v. *St. Louis Union Trust Co.,* 296 U. S. 48, 53, and *Helvering* v. *St. Louis Union Trust Co.,* 296 U. S. 39, 46; *Klein* v. *United States,* 283 U. S. 231; and *Shukert* v. *Allen,* 273 U. S. 545.

## II. The Second Proposal Is for the Application of the Doctrine of the Clifford Case.

To apply the doctrine of *Helvering* v. *Clifford, supra,* to the case before us is, in effect, to substitute that doc-

trine for the doctrine of the *Reinecke* case. Heretofore, this Court has made no application of the doctrine of the *Clifford* case to § 811 (c) or to any of its predecessor Sections. That doctrine has been reserved largely for income tax cases. All the facts appropriate for a decision in this case under the doctrine of the *Clifford* case have not been presented. The absence of those facts from the record and the absence of this issue from the arguments made below emphasize the inappropriateness of a remand to introduce such facts at this late point in this proceeding. Nothing suggests that this trustee has practiced fraud, or tax evasion, or has violated his obligations as a trustee. The trust became irrevocable at its inception. It thus contrasts sharply with any testamentary instrument which the settlor might have executed. There is nothing in it to suggest that the settlor, even as a sole surviving trustee, would be free from strict accountability to the beneficiaries of the trust or from an obligation to use his discretion in their interest rather than in his own. There is no more of an express provision in this trust for the possibility of a reverter to the settlor than there was in the *Reinecke* case. The countless uncertainties which would arise in other cases from a retroactive application to this statute of the doctrine of the *Clifford* case might be nearly as great as those which would flow from a reversal of the *Reinecke* case.

Furthermore, there is a sharp contrast between § 22 (a)[3] and § 811 (c) of the Internal Revenue Code as a starting point for the application of the doctrine of the *Clifford* case. Section 22 (a), upon which the *Clifford*

---

[3] "SEC. 22. GROSS INCOME.

"(a) GENERAL DEFINITION.—'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership

case rests its expansion of the traditionally taxable income of the taxpayer, invites or at least permits the broad interpretation given to it. Section 811, on the other hand, contains no sweeping inclusions. Whatever breadth of language it contains is in § 811 (a), whereas § 811 (c) is in the nature of a special exception from the broad field of transfers *inter vivos.* Section 811 (c) seeks to apply the estate tax to certain identifiable classifications of such transfers where experience has indicated that, in spite of their form, Congress believes they should be subjected to estate tax. The historical development of § 811 (c) bears out this interpretation. It has been extended only by the addition of specifically described classifications. The same is true of the revocable transfers described in § 811 (d), of joint and community interests in § 811 (e), of powers of appointment in § 811 (f), of proceeds of life insurance in § 811 (g), of transfers of prior interests in § 811 (h) and of transfers for insufficient consideration in § 811 (i). If Congress had intended to sweep into the gross estate of the decedent broad classifications of transfers *inter vivos,* contrary to the limitations upheld in *Reinecke* v. *Northern Trust Co., supra,* or as would result from the application of the doctrine of *Helvering* v. *Clifford,* many of the foregoing specific extensions would not have been necessary. The very specificity of the terms of § 811 (c) and of its related subsections emphatically negative any broad interpretation of their language. No language of a breadth comparable to that used in § 22 (a) appears anywhere in the Section.

To apply the doctrine of the *Clifford* case to the Spiegel trust because of the powers which the Spiegel trust vested

---

or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. . . ." 53 Stat. 9, 26 U. S. C. (1940 ed.) § 22 (a).

in the settlor as a trustee conflicts with the position taken by this Court as to the "five trusts" in the *Reinecke* case, *supra*. For example, the powers reserved directly to the settlor under Trust No. 4477 in the *Reinecke* case not only are equal to but, in some ways, are broader than those vested in the settlor, as a trustee, in the Spiegel trust. The very fact that in Trust No. 4477 the reservations were made directly to the settlor in his personal capacity, rather than to him as a trustee, removes from them the traditional limitations which equity places upon a trustee in the exercise of powers which he holds for the benefit of his *cestui que trust*. In Appendix II, *infra*, p. 737, Trust No. 4477 is quoted in full from the record in the *Reinecke* case and a number of the especially material clauses have been italicized. While the terms of that trust were not quoted verbatim in the opinion of this Court in the *Reinecke* case, this Court there summarized several of them[4] and said:

> "Nor did the reserved powers of management of the trusts save to decedent any control over the economic benefits or the enjoyment of the property. He would equally have reserved all these powers and others had he made himself the trustee, but the transfer would not for that reason have been incomplete. The shifting of the economic interest in the trust property which was the subject of the tax was thus

---

[4] ". . . The settlor reserved to himself power to supervise the reinvestment of trust funds, to require the trustee to execute proxies to his nominee, to vote any shares of stock held by the trustee, to control all leases executed by the trustee, and to appoint successor trustees. With respect to each of these five trusts a power was also reserved 'to alter, change or modify the trust,' which was to be exercised in the case of four of them by the settlor and the single beneficiary of each trust, acting jointly, and in the case of one of the trusts, by the settlor and a majority of the beneficiaries named, acting jointly." 278 U. S. at p. 344.

complete as soon as the trust was made. His power to recall the property and of control over it for his own benefit then ceased and as the trusts were not made in contemplation of death, the reserved powers do not serve to distinguish them from any other gift *inter vivos* not subject to the tax." (At pp. 346–347.)

This Court thus showed that all of the powers reserved directly to the settlor, even if coupled with the "others" of the trustee, would not subject that trust to the estate tax. This is especially significant because the issue now presented had been brought squarely before this Court in the *Reinecke* case by the following question in the Government's brief:

"1. Do the words of Section 402 (c) of the Revenue Act of 1921, which provide that, for the purpose of measuring the estate tax, there shall be included in the value of decedent's gross estate trusts intended to 'take effect in possession or enjoyment at or after his death,' embrace:

.           .           .           .           .

"(*b*) Trusts created after the effective date of a similar and earlier Act, where the settlor reserved the power to sell and reinvest the trust property; vote the stock; control leases; reappoint trustees; and, jointly with the beneficiaries, to alter, amend, or modify the trust. (This applies to Trusts Nos. 4477, 4478, 4479, 4480, and 4481, respectively, appearing in the record at pp. 3, 17, 25, 32, 40.)" [5]

---

[5] Upon the reargument of the instant case and the *Church* case, we requested counsel to discuss particularly nine questions insofar as those questions were relevant to the respective cases. The first question has been quoted *supra* at p. 711. The rest are quoted below and, of these, numbers 2, 6, 8 and 9 bore upon this alternative solution:

"2. Assuming that, under the applicable state law, there arose,

For us to hold that § 811 (c) applies here because of the powers which have been vested in the settlor-trustee under the Spiegel trust would, therefore, amount to over-

by operation of law, a possible reverter in favor of the settlor's estate, did section 811 (c) require that the value of the corpus, in view of the record in the case, be included in the settlor's gross estate for federal estate-tax purposes?

"3. Did section 811 (c) of the Internal Revenue Code, in 1939, require the inclusion in the settlor's gross estate of the value of the corpus of a trust because the settlor, by its terms, had, in 1924, reserved to himself a right to the income of the trust until his death, the reservation thus being made before the March 3, 1931, amendment of that section?

"4. Were the joint congressional resolution of 1931 (46 Stat. 1516–1517), and subsequent related estate-tax statutes, intended to be a repudiation of this Court's May v. Heiner (281 U. S. 238) interpretation of the estate-tax statutes?

"5. Did the May v. Heiner estate-tax interpretation survive the congressional resolution and this Court's holding and opinion in Helvering v. Hallock (309 U. S. 106)?

"6. Under section 811 (c) is the 'possession and enjoyment' of the corpus of an *inter vivos* trust 'intended to take effect * * * at or after' the settlor's death, where he names himself as cotrustee with the broad control and administrative powers over the corpus and income here vested, and where the corpus is withheld from the beneficiaries until the settlor's death?

"7. In the light of this Court's opinion in Helvering v. Hallock does the Hassett v. Welch (303 U. S. 303) interpretation of the 1931 congressional resolution have controlling relevance in determining whether the estate tax shall be applied to the Church properties transferred to beneficiaries under a trust created before 1931 but in which Church retained the net income from the trust properties during his life?

"8. Assuming that under the 'refined technicalities of the law of property' the 'possession and enjoyment' of the trust properties here be deemed to have passed to the beneficiaries when the trust was created, are the transfers so much 'akin to testamentary dispositions' as to make them subject to the estate-tax statutes? (See Helvering v. Hallock, p. 112.)

"9. What is the effect of the rulings of Helvering v. Clifford (309 U. S. 331) upon these trusts?" Journal Supreme Court, Oct. Term, 1947, pp. 297–298.

ruling the decision of this Court in the *Reinecke* case which held that the corresponding language of § 402 (c) of the Revenue Act of 1921 did not apply in that case.[6]

The failure to remand this case for the determination of further facts which would be material under the tests of the *Clifford* case does not settle the question that has been argued as to the application of those tests under § 811 (c). It does, however, show that this Court has not been willing to rest its decision upon the application of the doctrine of the *Clifford* case on the basis of the terms of this trust and of the facts shown by the present record.

COMMON BASIS FOR THE THIRD, FOURTH AND FIFTH PROPOSALS.

THE MATERIAL FACTS.

The important facts in this case are the terms of the trust instrument and the intent of the settlor. The terms of the instrument are those to which the law of Illinois must be applied to determine whether there arose, by op-

---

[6] A somewhat comparable but less direct conflict is presented by *Goldstone* v. *United States,* 325 U. S. 687. There substantially complete control over the disposition of the proceeds of insurance contracts was placed by the insured in the discretion of his wife, who also was the primary beneficiary. A minority of this Court sought to apply the doctrines of the *Hallock* case and the rationale which inheres in the *Clifford* case to the extent of recognizing the transaction as, in substance, a completed gift to the wife of the insured, and therefore not subject to the estate tax. This Court, however, did not, in that case, apply the Clifford doctrine to the estate tax. But see *Richardson* v. *Commissioner,* 121 F. 2d 1 (C. A. 2d Cir.), cert. denied, 314 U. S. 684, where it was held that, under the *Clifford* case, a trustee, with a broad power of revocation which might at any time be exercised for his own benefit, was himself liable for the income tax on the income of the trust. See also, *Bunting* v. *Commissioner,* 164 F. 2d 443 (C. A. 6th Cir.), cert. denied, 333 U. S. 856; 47 Mich. L. Rev. 137 (1948).

eration of law, any possibility of a reverter in favor of the settlor which might have been transferred, cut off or obliterated by the settlor's death. In 1920 the settlor made an irrevocable transfer, in Illinois, by trust, of certain corporate securities with directions to the trustees to pay the income of the trust, during the life of the settlor, to his three named children, but, if any of such children predeceased the settlor, the payments were to go to the children of such deceased child or children *per stirpes*. If there were no surviving child of a deceased child of the settlor, the payments were to go to the other children of the settlor and to their descendants *per stirpes*. Similarly, upon the settlor's death, the trust fund and any accumulated income thereon were to be divided among the settlor's three children. It was provided, with obvious care, that, if any of the settlor's children had by that time died, leaving any child or children surviving, then the child or children of such deceased child of the settlor was or were to receive the share of the trust fund to which its or their parent would have been entitled. Furthermore, if any of the settlor's three children died without leaving any child or children surviving, then the share of such deceased child was to go to the settlor's remaining children and to the descendants of any deceased child of the settlor *per stirpes*. No further express provision was made for the disposition of the income or of the corpus of the trust in the event, for example, that none of the settlor's three children and no descendants of such children survived the settlor. The instrument contained no further intimation of any intent or even thought on the part of the settlor that in any manner there might arise in favor of the settlor or of his estate, any beneficial interest, or right to, or control over the possession or enjoyment of the income or corpus of the trust.

The gift was not made in contemplation of death. At that date there was no law prescribing a federal gift

720

tax applicable to it. The trustees named in the trust were the settlor himself and one other person whose relationship, if any, to the settlor does not appear in the record. Both were residents of Illinois. Their powers of management were comparable to those commonly granted to trustees to handle a trust estate consisting originally of such securities as were transferred here. The trust mentioned no power of appointment and no power to alter, amend, revoke or terminate the trust. At the creation of the trust, the age of the settlor was 47 and he was a widower. His three only children were, respectively, about 22, 15 and 12 years old. He then had no grandchildren. In 1940, when he died, he was 68 and his children were, respectively, 43, 36 and 33. He then had three grandchildren, aged, respectively, ten, four and two. Throughout his life the income of the trust was distributed to and for the benefit of his three children and upon his death the entire fund was distributed equally among them.

### The Possibility of a Reverter to the Settlor.

In addition to his broader claims discussed under the first and second proposals, the Commissioner has presented a narrow claim. This is a claim that if, by operation of law, there arises from the trust a reversionary interest in the settlor or in his estate, or if there exists even a gossamer thread of a possibility of a reverter to the settlor or to his estate, and if such interest, "string or tie" were, by the terms of the trust, to be transferred, cut off or obliterated by his death, then, under existing precedents, the entire trust property should be included in the gross estate of the settlor for federal estate tax purposes. There is no issue made here as to the amount of the tax if any is due. The petitioners' claim is simply that no estate tax is applicable to the trust fund.

## III. The Third Proposal.

##### ILLINOIS LAW PRECLUDES THE POSSIBILITY OF A REVERTER.

On this branch of the case the first inquiry must be as to the law of Illinois and the second as to its application to this trust. A determination of the Illinois law and of its application adversely to the taxpayers would be conclusive against them, unless relieved by the rule of *de minimis* under the fourth proposal, or by a finding favorable to them on the issue of the settlor's factual intent under the fifth proposal. On the other hand, a finding favorable to the taxpayers upon either the principle or the application of the law of Illinois would dispose of this case in their favor. This very conclusiveness of the state law under this proposal is a weighty consideration in favor of the interpretation of the statute presented by the fifth proposal. A federal policy of complete dependence upon state laws for the application of any nationwide tax cannot fairly be attributed to Congress without a much clearer expression of such a policy than appears in § 811 (c). The inherent difficulty of administration and the resulting inequality of taxation as between instruments governed by the laws of different states argue strongly against such a policy.

This Court, as a settled practice, places much reliance upon announcements by Courts of Appeals as to the law of the states within their respective Circuits.[7] The weight to which such announcements are entitled will vary with the circumstances under which they are made. In this case we have an announcement by the Court of Appeals for the Seventh Circuit on the law of Illinois as to the effect of contingent remainders contained in

[7] See *Helvering* v. *Stuart,* 317 U. S. 154, 163–164; *MacGregor* v. *State Mutual Co.,* 315 U. S. 280.

a trust and pointing out that, under the law of Illinois, they create reversionary interests in the settlor. Our difficulty here is not with the law as thus stated but with the application made of it to this case. The trouble is that the trust in this case contains not contingent remainders but vested remainders, and it is clear that, under the law of Illinois, no reversions, reversionary interests, resulting trusts or "possibilities of a reverter" of any kind can arise by operation of law from a vested remainder. This is due to the essential difference between a contingent remainder and a vested remainder. If the law of Illinois is to control the situation, there is no escape from the determination of this clear-cut issue under the law of that State.

The failure of a condition precedent upon which a contingent remainder depends under a trust results naturally enough in a reversion of the undisposed-of beneficial interest to the settlor of the trust. On the other hand, the failure of a condition subsequent attached to a vested remainder under a trust results equally naturally only in a failure of the divestiture contemplated by the condition. The effect of such a failure of a condition subsequent attached to a vested remainder is not a reversion of an undisposed-of beneficial interest to the settlor of the trust. It merely relieves the holder of the vested remainder and his legatees and next of kin from the possibility of the divestiture to which the remainder originally had been subjected.

The Court of Appeals in the instant case has made no announcement of Illinois law contrary to that just stated. In fact, it made no announcement whatever on the subject of vested remainders because it treated the Spiegel remainders as contingent.[8] The foregoing ele-

---

[8] "Applying this law to the instant case, we think it follows that the interests under this trust did not vest upon the execution of the

mental statement as to the legal effect of contingent remainders and of vested remainders subject to conditions subsequent conforms to the generally accepted law of trusts [9] and to the law of Illinois.[10]

This brings us near to the decisive question whether the remainder interests written into the Spiegel trust were contingent or vested. The Commissioner has suggested that it makes little substantial difference whether a condition is a condition precedent or a condition subsequent, as long as it is a condition. That is so for many purposes but where, as here, a tax, by hypothesis, can

trust, as contended by the taxpayer, and could only vest upon the happening of the condition precedent, namely, that the beneficiaries or some of them survive the settlor, and this was the 'event which brought the larger estate into being for the' beneficiaries." *Commissioner* v. *Spiegel's Estate,* 159 F. 2d 257, 259.

[9] "Where property is given in trust for one beneficiary for life and to another beneficiary in remainder, and before the termination of the trust the latter beneficiary dies intestate and without heirs or next of kin, it would seem that his interest passes to the state, and that a resulting trust will not arise in favor of the settlor or his estate. In such a case, since the entire beneficial interest, subject to the preceding life estate in the other beneficiary, vested in the beneficiary entitled in remainder absolutely at the time of the creation of the trust, it would seem that the trust does not fail on his death, so as to give rise to a resulting trust, but his interest passes to the state as *ultimus haeres.* On the other hand, if the beneficial gift over is contingent, and the contingency does not occur, a resulting trust will arise in favor of the settlor or his estate." 3 Scott On Trusts, § 411.5 (1939).

[10] The Illinois cases establish the rule that, when a vested estate in remainder has been created, the divestment of that estate in favor of some other beneficiary can take place only in literal compliance with the divesting conditions set forth by the settlor. *Henderson* v. *Harness,* 176 Ill. 302, 52 N. E. 68. See *Illinois Land Co.* v. *Bonner,* 75 Ill. 315; *McFarland* v. *McFarland,* 177 Ill. 208, 217, 52 N. E. 281, 284; and *Continental Illinois Nat. Bank* v. *Kane,* 308 Ill. App. 110, 31 N. E. 2d 351. See also, 42 Ill. L. Rev. 561, 564. This does not leave room for reversion to the settlor by operation of law.

attach only if some possibility of a reverter can arise in favor of the settlor before his death, then it is inescapably necessary to determine whether or not, by operation of the law of Illinois, such a possibility of a reverter can arise under this trust. To say in such a situation that the language of the conveyance makes no difference is to beg the question. The possibility is not expressly spelled out or denied. Its existence, like the existence of any other beneficial interest in the trust, must depend upon the effect given by Illinois law to the words of art in the conveyance. In the last analysis the problem is to determine whether or not the settlor intended by his language that the possession and enjoyment of his property were to return to him upon failure of the express dispositions of the beneficial interests in it. If the settlor had wished to express himself in detail he could have done so. Here, however, he used only the customary language of conveyancing and it remains to see what effect the Illinois law gives to that language.

In the helpful light of *Lachenmyer* v. *Gehlbach,* 266 Ill. 11, 107 N. E. 202, the remainders in the Spiegel trust are shown to be vested remainders, carrying conditions subsequent. See also, *Stombaugh* v. *Morey,* 388 Ill. 392, 58 N. E. 2d 545; *Murphy* v. *Westhoff,* 386 Ill. 136, 53 N. E. 2d 931; *Danz* v. *Danz,* 373 Ill. 482, 26 N. E. 2d 872; *Smith* v. *Shepard,* 370 Ill. 491, 19 N. E. 2d 368; *Hoblit* v. *Howser,* 338 Ill. 328, 170 N. E. 257; *Boye* v. *Boye,* 300 Ill. 508, 133 N. E. 382; *McBride* v. *Clemons,* 294 Ill. 251, 128 N. E. 383; *Hickox* v. *Klaholt,* 291 Ill. 544, 126 N. E. 166; *Welch* v. *Crowe,* 278 Ill. 244, 115 N. E. 859. Cf. *Freudenstein* v. *Braden,* 397 Ill. 29, 72 N. E. 2d 832. No distinction has been drawn in the Illinois cases between interests created by *inter vivos* deeds and like interests created by testamentary documents. See *Smith* v. *Dugger,* 310 Ill. 624, 625, 142 N. E.

243, 244, where the Illinois Supreme Court relied upon *Lachenmyer* v. *Gehlbach, supra,* in construing an *inter vivos* deed. See also, *Harder* v. *Matthews,* 309 Ill. 548, 141 N. E. 442.[11]

---

[11] The basis of distinction necessarily rests with the form of the statement employed. A classic definition of the distinction between contingent and vested remainders is that in Gray, The Rule Against Perpetuities, § 108, quoted as follows in *Lachenmyer* v. *Gehlbach,* 266 Ill. 11, 18–19, 107 N. E. 202, 205:

"A test which is generally regarded as sufficient to determine the question and which has been generally adopted is stated as follows: 'If the conditional element is incorporated into the description of or into the gift to the remainder-man then the remainder is contingent, but if, after words giving a vested interest, a clause is added divesting it the remainder is vested. Thus, on a devise to A for life, remainder to his children, but if any child dies in the lifetime of A his share to go to those who survive, the share of each child is vested, subject to be divested by its death. But on a devise to A for life, remainder to such of his children as survive him, the remainder is contingent.' "

The language in the Spiegel and the Lachenmyer trusts is closely comparable. In each case the gift to children of the settlor is a vested gift. In the Spiegel trust the children's interest was a vested primary interest (subject to conditions subsequent) and in the Lachenmyer trust the children's interest was a vested remainder following a life interest in favor of the testator's wife (and in turn subject to conditions subsequent). In both cases the language making the gifts over is in the form of a divestiture—comparable to that in the classic example quoted above *"but if any child dies in the lifetime of A* his share to go to those who survive, . . . ." (Italics supplied.)

The material provision of the Spiegel trust, italics supplied, is as follows:

"3. Upon my death, the said Trustees, and the survivor of them, or any successor Trustee, shall divide said trust fund, and any accumulated income thereon then in the hands of said Trustees, *equally among my said three (3) children, and if any of my said children shall have died,* leaving any child or children surviving, *then* the child or children of such deceased child of mine shall receive the share of said trust fund to which its or their parent would have been entitled,

For these reasons, by operation of the law of Illinois, there here existed no possibility of a reverter to the settlor and, therefore, the federal estate tax cannot attach to it. To the extent that the Commissioner relies upon the law of Illinois to establish in this case the possibility of a reverter to the settlor, by operation of the Illinois law, he has been "hoist with his own petard."

IV. THE FOURTH PROPOSAL ASSUMES THAT A POSSIBILITY OF A REVERTER EXISTS AND THAT THE FACTUAL INTENT OF THE SETTLOR MAY BE DISREGARDED.

This proposal is reached only if the foregoing conclusions as to the law of Illinois are disregarded. It is the solution adopted in the opinion of the Court. If it is assumed that the possibility of reverter in favor of the settlor may be said to have arisen under the law of Illinois,

---

and if any of my said three (3) children shall have died without leaving any child or children him or her surviving, then the share to which such deceased child of mine would have been entitled shall go to my remaining children, and the descendants of any deceased child of mine per stirpes and not per capita."

The corresponding provision of the Lachenmyer trust, italics supplied, is as follows:

"Third—After the death of my said wife all of said property and estate above mentioned and described to go to my children, share and share alike, and shall any of my children die, then the children of such deceased child, should any children be surviving such deceased child, to take the share of the parent so deceased; and should any of my children die leaving no issue, then the share of such deceased child shall be divided equally among my surviving children." Lachenmyer v. Gehlbach, supra, at p. 13.

Contrasting provisions, specifically recognized by the court below as examples of contingent remainders in an inter vivos trust, are found in Klein v. United States, 283 U. S. 231, 232–233. The court below also cited Haward v. Peavey, 128 Ill. 430, 21 N. E. 503, and Baley v. Strahan, 314 Ill. 213, 145 N. E. 359, involving wills and recognizing the contingent character of the remainders in the Klein case.

then under existing precedents, if we look no further, the federal estate tax would be applicable here and a decision is called for against the taxpayers. The fifth proposal presents the view that the statute requires us to look further and to determine the issue in reliance upon the factual intent of the settlor. However, even without going that far, a substantial case can be made in favor of the taxpayers even under this fourth proposal. That case is based upon the extreme remoteness of the possibility of reverter which is relied upon by the Commissioner. The remoteness of it is obvious from the fact that, even at the time of the execution of the trust when the chances of its realization were at their highest point, the possible reverter to the settlor was conceivable only if all three of the children of the settlor were to die before he did and were to die without descendants of their own. Disregarding the possibility of descendants of his children, the record shows an actuarial computation of the likelihood that the settlor would survive all three of his children of only about 1½ chances out of 100. On the basis of such a chance of realization, the computation gave a value of about $4,000 to a trust corpus of $1,000,000. To tax the settlor's estate more than $450,000, as is here proposed, because of the existence of this $4,000 worth of a possible reverter is not the kind of taxation that a court can readily imagine that Congress meant to impose. A proportion of 1½ to 100 suggests the appropriate application here of the maxim of *de minimis non curat lex*. The difficulty of applying that test as the sole basis of exemption is, however, obvious. On the other hand, this element of remoteness provides a thoroughly reasonable consideration which may be combined with other evidence to determine the presence or absence of the factual intent on the part of the settlor which is discussed in the fifth and final proposal.

## V. The Fifth Proposal.

THE STATUTORY INTENT OF THE SETTLOR REQUIRED TO MAKE
THE ESTATE TAX APPLICABLE IS ABSENT AND A CONTRARY
INTENT IS PRESENT.

The undisputed evidence shows that, at the time of the transfer by trust, there was an absence of conscious intent on the part of the settlor that the trust property, or any part of it, should ever return to him or to his estate. In fact, there is strong evidence showing that he intended affirmatively to make a complete and irrevocable transfer which would exclude all possibility of a reverter to him. The trust recited as complete a transfer as any outright deed of gift would have recited if made directly to his children, except for the natural feature that, at their immature age, the transfer was made to trustees and these trustees were required by the irrevocable terms of the trust to deliver complete title to the settlor's children, or to their descendants, at a future date. The settlor's intent and the completeness of the transfer would have been no more complete if, instead of fixing the date for the future distribution of the trust property at the date of his own death, he had fixed it arbitrarily at December 19, 1940, which later proved to be the date of his death. The intent and completeness of the transfer, similarly, would have been no more complete if he had fixed the date of termination of the trust to coincide with the death of a third person instead of with his own death.

## The Statute Requires a Finding of the Settlor's Intent.

Section 811 (c) requires us to find the settlor's intent as a condition of the application of that Section to this case. Accordingly, if the settlor had used language in his trust instrument which expressly, or even impliedly, had created or recognized a possible reverter in favor of the

settlor, that language in itself would have been evidence that the settlor had intended the trust to include a reverter in his favor and that he had intended the trust property, in the event of a realization of that reverter, to pass from him to his estate, under the 1920 trust, upon the expiration of that trust at his death.

It is, however, in the complete absence of such language in the trust instrument that the Government now claims that a possible reverter has arisen by operation of law. The existence of such a reverter, accordingly, may or may not have been *intended* in fact, and may not have been even thought about by the settlor. To say that the settlor must have intended all the legal consequences of his acts begs the question. So construed, the Section would have the same meaning as if the word "intended" had been omitted.

"Intended" should be given its normal, factual meaning. To intend means to "have in mind as a design or purpose." [12] The question of intent is one of fact, difficult to determine, but determinable, nevertheless. Section 811 (c) involves more than merely determining whether a transfer took effect, as a matter of law, at or after death or whether a "string or tie," as a matter of law, was retained until death. There remains for determination the fact whether the settlor did actually intend that the 1920 transfer take effect in possession or enjoyment upon the expiration of the trust at his death.

Section 811 (c) expressly covers transfers either *"in contemplation of* or *intended to take effect in possession or enjoyment at* or after . . . *death."* (Italics supplied.) We have held that the settlor-decedent's motive must be determined before it can be held that a transfer was in contemplation of death. *United States* v. *Wells,* 283 U. S. 102. That case included a transfer in trust,

---

[12] Webster's New International Dictionary, 2d ed. (1938).

*inter vivos,* which was held not to have been made in "contemplation of . . . death." Similarly, factual intent should be found in order to determine whether a transfer was "intended to take effect in possession or enjoyment at or after . . . death." In *United States* v. *Wells,* Chief Justice Hughes, speaking for the Court, said (pp. 116–117):

> "The quality which brings the transfer within the statute is indicated by the context and manifest purpose. Transfers in contemplation of death are included within the same category, for the purpose of taxation, with transfers intended to take effect at or after the death of the transferor. The dominant purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax. . . . As the transfer may otherwise have all the indicia of a valid gift *inter vivos,* the differentiating factor must be found in the transferor's motive."

In cases involving "contemplation of . . . death" under § 811 (c) the required motive impelling a transfer *"is a question of fact in each case."* (Italics supplied.) See *Allen* v. *Trust Co. of Georgia,* 326 U. S. 630, 636. So also, in each case under § 811 (c), the question whether "the decedent has at any time made a transfer, by trust or otherwise, . . . intended to take effect in possession or enjoyment at or after his death, . . ." should be one of fact.

In determining the issue as to the settlor's intent in making his 1920 transfer, *inter vivos,* in the present case, the following considerations are material and persuasive:

1. *Language of the trust instrument.*—There was no language in this instrument which expressed or even affirmatively implied an intent to make a transfer to take effect in possession or enjoyment at or after the death of

the settlor rather than *in praesenti*. If the trust instrument had contained such an express or affirmatively implied declaration of the settlor's intent, it might have been conclusive of the issue. If there had been even a description of, or reference to, a possible reverter to the settlor, that would have been strong evidence of the intent required by § 811 (c). The absence of any such description or reference was consistent with a lack of intent that there be such a reverter. It was negative evidence to the effect that such a reverter was not intended and not desired by the settlor.

In an instrument of this kind it is natural for the settlor to give affirmative expression to each beneficial use to which he intends or desires the trust property to be put. It cannot be argued effectively in this case that the complete silence of the trust instrument on the subject of a possible reverter of the trust property to the settlor or to his estate amounted to an expression of intent by the settlor that such a reverter be permitted to arise by operation of law. As a matter of fact, the extrinsic evidence presented in this case tended to establish an opposite intent and desire.

In the present case, the overwhelming improbability of a complete failure of beneficiaries was so complete that it supplied a natural reason for omitting further provisions for distribution of the trust property. The likelihood that a 47-year-old settlor would outlive his three children and also his prospective grandchildren obviously was small. As it turned out, none of the settlor's three children predeceased him, and the distribution of the trust property was made to them without reaching his grandchildren. The facts of this case as they existed in 1920 presented to the settlor quite a different problem from that which would have been presented if, at that time, he had named as the only beneficiary of the trust a person with a life expectancy obviously shorter than his own.

Standing alone, the instrument evidences a simple transfer *in praesenti,* comparable to that in *Reinecke* v. *Northern Trust Co., supra.* The language of the instrument, therefore, certainly did not, in itself, require the property which was transferred, in 1920, to be included, in 1940, in the settlor's gross estate for federal estate tax purposes. If anything, the language itself, read in the light of Illinois law as stated above in the discussion of the third proposal and as regarded by the settlor in the light of the advice of his legal counsel, is expressive of an intent that there be no possibility of a reverter, and of an intent to make an absolute and complete transfer to the trustees *in praesenti.*

2. *Remoteness of the possible reverter.*—The remoteness of the possible realization of a suggested reverter (whether arising from express provision of a trust or by operation of law) is an important factor in establishing the probable intent of the settlor of any trust to make, thereby, a transfer to take effect in possession or enjoyment at or after his death. If the 1920 trust instrument had named as its sole beneficiary a person having a comparatively short life expectancy, then, assuming a reversion in favor of the settlor under Illinois law, the possibility of its occurrence would have been substantial. It would have been so great that, if the settlor had expressly mentioned such a reversion in the trust instrument, that mention of it would have substantially demonstrated the existence of the intent required by § 811 (c). Even if the settlor had made no express mention of such a reversion and thus had left its effectiveness wholly to the operation of the law of Illinois, the circumstances themselves, including the high probability of the realization of the reversion, would have supplied important evidence upon which to base a finding of the required intent on the part of the settlor. However, with the inclusion

of each additional youthful beneficiary of the trust, the basis for a conclusion that the settlor intended to establish a reversion to himself or to his estate and to postpone the transfer of the possession or enjoyment of the property until at or after his death was weakened.

The Tax Court, upon undisputed evidence, reduced to a mathematical basis the possibility presented by the suggested reverter in this case. The computations were stated to have been based upon a mortality table and an assumed rate of interest prescribed in Treasury Regulations as applicable to federal estate taxes. The computations also were stated to have been based upon assumed ages of a settlor and of beneficiaries corresponding substantially with those stated in the facts of this case. The computations showed that the probability that a person of the age of this settlor would survive three persons of the respective ages of the primary beneficiaries who were living at the date of the creation of this trust was only 0.01612, or about 1½ chances out of 100. Similarly, the value of the right of a person, of the age of the settlor in 1920, to receive $1 on the death of the last of three persons of the ages of the primary beneficiaries was $0.00390.

In 1920, the most favorable computation would thus have placed a value of less than $4,000 upon the settlor's interest in the suggested reverter relating to a $1,000,000 trust fund. These computations do not take into consideration the additional possibility that many grandchildren might have been born in time to qualify as beneficiaries of this trust, and thus further reduce the possibility of reverter. In fact, three such grandchildren were born in time to qualify—thus reducing the value to the settlor, in 1940, of the suggested reverter, on a $1,000,000 trust fund, to about $70. The relation of $70 to $1,000,000 ordinarily would be *de minimis* and cer-

tainly not one which would induce Congress to permit the assessment of a tax of over $450,000 because of its existence.

This demonstration of the remoteness of the possible reverter, if any, in this case is persuasive at least in showing the fact to have been that the settlor, in establishing this trust, probably intended it to be nothing other than a completed gift to those of his children or their descendants who might survive him.

In 1920 the gift, as such, was tax-free. Such a gift today would be subject to a gift tax. The assessment of a gift tax upon such a transaction emphasizes the impropriety, rather than the propriety, of also applying to it an estate tax at the death of the settlor. In 1920 the character of the gift was the same as it would be today and the fact that it was not subject to a gift tax then does not make it any more subject to the 1940 estate tax than if a gift tax had been paid upon it.

3. *Direct evidence of the intent of the settlor.*—Substantial evidence confirmed the absence of the factual intent necessary in order to make § 811 (c) applicable. There was no direct evidence indicating the existence of an actual intent on the part of the settlor to provide for a reverter to himself or to his estate or, in any other manner, to cause his 1920 transfer to trustees for the benefit of his descendants to take effect in possession or enjoyment at or after his death.

On the other hand, there was undisputed evidence indicating the absence of such an intent. In fact, it indicated the probable existence of a contrary intent. The Illinois attorney who drew the trust instrument testified that, prior to the drafting of the instrument, the settlor had stated that he desired and intended the trust property to be transferred to trustees for the benefit of his children and that he wanted at no time to retain any interest in it. The attorney added that, in drafting the trust, he had

endeavored to carry out the instructions of his client and that he believed he had done so. That attorney is a member of the firm representing the estate of the settlor-decedent in the instant case. As attorneys for the estate of the 1940 decedent, they argue that, under the law of Illinois, as they understood it and as they advised their client in 1920, there has not arisen any possibility of a reverter to the settlor under this trust by operation of law or otherwise. The receipt of that opinion by the settlor at the time of executing the trust instrument supports the petitioners' contention that the settlor then intended to translate into this Illinois trust his purpose to make an absolute and complete transfer of the subject matter of the trust, and thereby to make irrevocable provision for its future distribution.

In view of the uncontroverted and convincing evidence of the absence of any such factual intent on the part of the settlor as is required to bring his 1920 transfer within the terms of § 811 (c), and in view of the judgment of the Tax Court in favor of the settlor-decedent's executors, there is no need to remand the case to that court for a further finding in support of its judgment.

For the reasons stated in the foregoing discussion of the fifth proposal, and also for the reasons stated in the discussion of the third proposal to the effect that no possibility of a reverter arose in favor of the settlor by operation of the law of Illinois, I believe that the judgment of the United States Court of Appeals should be reversed.

Appendixes to MR. JUSTICE BURTON's dissent.

Appendix I.

The trust instrument which is the subject of the decision in *Spiegel* v. *Commissioner, ante,* p. 701, is as follows:

"Know All Men By These Presents, that I, Sidney M. Spiegel, of the City of Chicago, County of Cook and State of Illinois, in

consideration of One Dollar ($1.00) and other good and valuable considerations, have sold, transferred, assigned, set over and delivered, and by these presents do sell, transfer, assign, set over and deliver to Modie J. Spiegel and Sidney M. Spiegel, and the survivor of them, as Trustees, six hundred twenty-five (625) shares of the capital stock of Spiegel's House Furnishing Company and seven hundred fifty (750) shares of the capital stock of Spiegel May Stern Company, In Trust, nevertheless, for the following uses and purposes, and upon the following terms and conditions:—

"1: The said Trustees, and the survivor of them, or any successor trustee, shall have full, absolute and complete power to hold, manage and control said shares and every part thereof; to sell, exchange, transfer or otherwise dispose of the same, or any part thereof, and to invest and reinvest the proceeds derived from any such sale or sales, or other disposition of said shares, or any part thereof, during the continuance of this trust. While said shares of stock, or any substitutes therefor, are held by said Trustees, or the survivor of them, or any successor Trustee, if any corporation whose stock or other securities are held by said Trustees should require any action of any kind to be taken, said Trustees, and the survivor and any successor trustee, shall have the same right to take any action which may be required of any stockholder or holder of any securities of any such corporation as if said Trustees, and the survivor and any successor held such shares or said securities in their own individual names and were the sole owners thereof.

"2: The Trustees, and the survivor of them, and any successor trustee, shall collect and receive all income derived therefrom, or from any substitutes therefor, and shall during the life of myself, said Sidney M. Spiegel, divide said net income into three (3) equal parts, and pay or use one of said parts of said income to or for the maintenance, support and education of my three (3) children, Katherine J. Spiegel, Sidney M. Spiegel, Jr. and Julia K. Spiegel,—such income to be distributed at convenient intervals each year. In the event that any of my said three (3) children shall die prior to my death, then the share of such income to which such deceased one of said three (3) children would have been entitled shall go to the child or children of such deceased child of mine, in equal parts, and if there be no such child or children of any such deceased child of mine, then such income shall be divided equally among the survivors of said three (3) children of mine, and their descendants, per stirpes and not per capita.

"3: Upon my death, the said Trustees, and the survivor of them, or any successor Trustee, shall divide said trust fund, and any accu-

mulated income thereon then in the hands of said Trustees, equally among my said three (3) children, and if any of my said children shall have died, leaving any child or children surviving, then the child or children of such deceased child of mine shall receive the share of said trust fund to which its or their parent would have been entitled, and if any of my said three (3) children shall have died without leaving any child or children him or her surviving, then the share to which such deceased child of mine would have been entitled shall go to my remaining children, and the descendants of any deceased child of mine per stirpes and not per capita.

"4: If during the continuance of this trust there shall be any increase in the principal of said trust estate by reason of the declaration of any stock dividends or other increases or emoluments all such increases shall be and remain a part of said trust estate and shall be held by said Trustees upon the same terms and conditions as are herein set forth.

"5: In the event of the death, refusal, inability, or failure for any reason to act of both said Trustees at any time during the continuance of this trust, then The Chicago Title & Trust Company shall become the successor Trustee, with the same rights, powers, duties and obligations as are herein vested in and imposed upon the Trustees, and the survivor thereof, hereinbefore named.

"6: None of the beneficiaries of the trust estate shall at any time be permitted to anticipate the payments to which any of them may be entitled hereunder by any order, assignment or otherwise.

"In Witness Whereof I have hereunto set my hand and seal, at Chicago, Illinois, as of the 2nd day of January, 1920.

Sidney M. Spiegel.   (Seal)

"We hereby accept the above-named shares of stock and agree to hold the same subject to the terms above-mentioned, as of the 2nd day of January, 1920.

Modie  J.  Spiegel.   (Seal)<br>Sidney M. Spiegel.   (Seal)"

### Appendix II.

The Northern Trust Company trust instrument No. 4477, which is one of the "five trusts" considered in *Reinecke* v. *Northern Trust Co.*, 278 U. S. 339, is as follows (italics supplied):

"This indenture, made this first day of March, in the year of our Lord one thousand nine hundred and nineteen (A. D. 1919), by and between Adolphus C. Bartlett, of the city of Chicago, county of Cook, and State of Illinois, the party of the first part, and

the Northern Trust Company (hereinafter termed the 'trustee'), of Chicago, a corporation organized and doing business under the laws of the State of Illinois, the party of the second part, witnesseth:

## "Article First

"That the party of the first part, being desirous of establishing and creating the trust hereinafter mentioned, for the purposes and upon the terms set forth, in consideration of the premises and influenced by love and affection for the beneficiaries hereinafter named, does hereby sell, assign, transfer, and set over unto the trustee the following securities, to wit:

1,000 shares of the stock of the Northern Trust Company.
784 shares of the stock of the Commonwealth Edison Company.
300 shares of the stock of the Illinois Central Railroad Company.
300 shares of the common stock of the Chicago & Northwestern Railroad Company.
200 shares of the preferred stock of the Chicago & Northwestern Railroad Company.
100 shares of the stock of the Pullman Company.
5 bonds of Armour & Company, for $1,000 each.
15 bonds of Morris & Company, for $1,000 each.

"Also the following-described notes secured by mortgage on real estate in Phoenix, Arizona:

| Maker: | Amount |
|---|---|
| Rollin S. Howard | 5,000.00 |
| W. S. Dorman | 5,000.00 |
| Edgar O. Faucett | 22,500.00 |
| Elisha T. Waters | 5,000.00 |
| Roy S. Goodrich | 40,000.00 |
| Wilson W. Dobson | 7,000.00 |
| Redwell Music Company | 20,000.00 |
| Pauline M. O'Neil | 25,000.00 |
| Pauline M. O'Neil | 5,000.00 |

to be held and disposed of under and in pursuance of this indenture.

## "Article Second

"The trustee shall have power and authority at any time, and from time to time—

"(1) To receive and collect all dividends declared and paid upon any shares of stock at any time subject to the terms of this agreement,

and the interest upon all moneys, bonds, and obligations at any time held by it hereunder, and also all rents and other income which shall accrue or become due and payable on or from any of the trust estate hereunder.

"(2) To sell, transfer, assign, and convey any or all of the stocks, bonds, obligations, securities, real estate, or other property held at any time by said trustee under this instrument, and to invest and reinvest the proceeds thereof in either real or personal property, including dividend-paying stocks of corporations; *provided, however, that during the life of said party of the first part said trustee shall be governed by any instructions or directions in writing given to it by said party of the first part in regard to the management, sale, or investment of any part of the said trust estate, and said trustee shall be free from any liability or responsibility for any action by it done under or in pursuance of any such written direction or instruction.* In no event shall any purchaser from the trustee, or any person or corporation dealing with the trustee, be required to ascertain the authority and power of the trustee to make any sale, conveyance, or transfer of any part of the trust estate held hereunder, but every such purchaser and all other parties shall be entitled to rely upon the delivery of the transfer, assignment, or conveyance by the trustee of any or all of said trust estate as having been in all respects fully authorized, and shall not be affected by any notice to the contrary, or be required to see to the application of the purchase money.

"(3) To exercise the voting power upon all shares of stock held by the trustee hereunder, and to exercise every power, election, and discretion, give every notice, make every demand, and do every act and thing in respect of any shares of stock or bonds, or other obligations and securities held by the trustee hereunder, which it might or could do if it were the absolute owner thereof; *provided, however, that upon the written request of said first party it shall be the duty of the trustee to execute, or cause to be executed, to the person or persons named in such requests a proxy, entitling him or them (with full power of substitution) to vote in respect of any shares of stock in such written request or proxy defined and mentioned, at any meeting or meetings of the stockholders of any corporation or corporations specified in such request and proxy.*

"(4) To receive any and all stock dividends declared, and any other distribution which may be made by any corporation, any of whose shares of stock at the time constitute a part of the principal of the trust estate, and also all proceeds which may be paid on or

in respect of any such shares of stock on the liquidation of the company issuing the same, or upon the sale (whether voluntary or involuntary) of its assets, or any part thereof, or which may be otherwise paid out of capital or on account of the principal of any bond, stock, or other security; and may in its discretion join in any plan of reorganization or of readjustment of any corporation, any of whose shares of stock, bonds, or other securities or obligations may at any time constitute a part of the principal of the trust estate, and accept the substituted securities in and by said plan allotted in respect to the securities and obligations so held by the trustee.

"(5) To execute leases of any real estate which shall form a part of the said trust at any time, at such rental, and upon such terms, and for such length of time (not exceeding two hundred (200) years) as it may deem best; to erect buildings, or to change, alter, or make additions to any existing buildings upon any real estate which may form a part of said trust estate; and to do all other acts in relation to the said real estate which in the judgment of said trustee shall be needful or desirable to the proper and advantageous management thereof, so as to protect the same and make the same productive; *provided, however, that in every case the said trustee shall observe and be governed by any instructions or requests in relation thereto made by an instrument in writing, signed by said first party.*

"Article Third—Distribution and application of income

"(1) During the joint lives of the said party of the first part and his wife, Abby H. Bartlett, the said trustee shall pay to the said Abby H. Bartlett the sum of two thousand dollars ($2,000.00) on the last day of each month, and the residue of said net income shall be accumulated in the hands of the said trustee and kept invested in the same manner as said trustee is authorized to invest the principal of said trust.

"The said payments to the said Abby H. Bartlett are in lieu of the monthly payments now being made to her under an existing agreements [*sic*], and not in addition thereto.

"(2) From and after the death of the said party of the first part, the said payment of two thousand dollars ($2,000.00) in each month shall continue to be made to the said Abby H. Bartlett, until she shall either die or become entitled to a share of said first party's estate otherwise than under his will, bearing even date herewith; and the residue of said net income shall in each year be paid by said trustee to the four (4) children of said party of the first part,

viz, Maie Bartlett Heard, Frederic Clay Bartlett, Florence Dibell Bartlett, and Eleanor Bartlett Perdue, or the survivors of them, in equal shares; provided, however, that in the event of the death of either of said children of said party of the first part leaving issue surviving, such surviving issue shall stand in the place of such deceased child and receive the share of said net income which such deceased child would have received if living; it being the intention of said party of the first part that all payments to his wife, Abbey [*sic*] H. Bartlett, under this trust shall cease and be at an end upon her becoming entitled to any share or portion of his estate otherwise than under his will, bearing even date herewith, and that, subject to the payments hereinbefore directed to be made to said Abby H. Bartlett, the net income of said trust estate shall be paid to the children of said party of the first part (and the issue of any deceased child) in the shares above specified during the continuance of the trust hereby created.

"Article Fourth—Distribution of principal of trust estate

"The trust hereby created shall terminate at the expiration of five (5) years from the death of the party of the first part unless the said Abby H. Bartlett shall then be living and be entitled to receive monthly payments out of the net income of said trust estate under the provisions of this indenture, in which case this trust shall continue until the death of said Abby H. Bartlett, and shall then terminate.

"Upon the termination or expiration of the trust hereby created, the trust estate then in the hands of said trustee shall be paid over and distributed as follows:

"(a) One-fourth (¼) thereof to each of the four (4) children of said party of the first part hereinbefore named, viz, Maie Bartlett Heard, Frederic Clay Bartlett, Florence Dibell Bartlett, and Eleanor Bartlett Perdue;

"(b) If either of said four (4) children shall not then be living, his or her one-fourth (¼) of said trust estate shall be paid over and distributed to the then surviving issue of such deceased child per stirpes; and in default of such surviving issue, then to the surviving issue of said party of the first part per stirpes.

"Article Fifth—Concerning the trustee

"The trustee hereby accepts the trust created by this indenture, and agrees to act in accordance with its terms and provisions. The trustee may consult with counsel and shall be fully protected in

any action or nonaction taken, permitted or suffered by it in good faith and in accordance with the opinion of counsel selected or provided by it; and in case of legal proceedings involving the trustee or the principal of the trust estate, the trustee may defend such proceedings or may, upon being advised by such counsel that such action is necessary or advisable for the protection of the interests of the trustee, or of the beneficiaries, institute any legal proceedings.

"The trustee shall be reimbursed and indemnified against any and all liability, loss, or expense because of the holding of any shares of stock or other properties constituting a part of the principal of the trust estate, either in its own name or in the name of a nominee, and shall have a lien upon the principal of the trust estate and the income therefrom for the amount of any liability, loss, or expense which may be so incurred by it, including the expense of defending any action or proceeding instituted against it or such nominee by reason of any such holding.

"Out of the income of the principal of the trust estate the trustee shall pay all taxes, assessments, or other governmental charges which it may be required to pay or to retain because or in respect of any part of the principal of the trust estate or the income therefrom or the interest of the trustee therein, or the interest of any beneficiary or other person therein, under any present or future law of the United States, or of any State, county, municipality, or other taxing authority therein, any and all such taxes, assessments, or other governmental charges lawfully imposed being charged as a lien upon the said income, and in case of deficiency of said income upon the principal of the trust estate.

"All payments or distribution of income to beneficiaries in this indenture provided for shall be made out of net income, current or accumulated, then in the hands of the trustee.

"The said trustee, or any successor in trust, may resign at any time by giving notice in writing of such resignation to said first party while he shall live, and after his death by giving notice in writing of such resignation to either one of the beneficiaries hereinbefore named.

"*In case of the resignation of any trustee acting hereunder, or of its disability or incapacity to further act as trustee, the said party of the first part, if living,* and after his death a majority of the five (5) beneficiaries hereinbefore named, viz, the wife and four (4) children of said party of the first part, or a majority of the survivors of them, *shall have power to appoint a successor* in trust by an instrument in writing duly signed by him or them and delivered to said trustee,

and upon the appointment of such successor in trust the said trustee shall convey, assign, transfer, and deliver to such successor in trust all of the trust estate then in its hands, and thereupon and thereafter such successor in trust shall have all the rights, powers, duties, and authority which are granted to or imposed on said original trustee under the provisions of this indenture.

"Article Sixth—Miscellaneous provisions

"(1) *Said grantor has created the foregoing trusts to provide for the support and maintenance of the beneficiaries entitled to share in the income of said trust estate, and the said beneficiaries shall have no power to anticipate, assign, or otherwise dispose of or encumber their respective interests in said trust estate, and the same shall not be subject to be taken from them by process of law.*

"(2) *Any of the provisions of this trust deed may be altered, changed, or modified in any respect and to any extent at any time during the life of said party of the first part by the delivery to said trustee of an instrument in writing signed by said party of the first part and by a majority of the five (5) beneficiaries hereinbefore named, or by a majority of the survivors of said five beneficiaries.*

"(3) The beneficiaries, or any or either of them, may act through an attorney in fact in signing any and all instruments delivered to the trustee under this indenture, with like effect as though signed in person, and any or either of said beneficiaries may act as such attorney in fact when authorized so to do.

"In witness whereof the parties hereto have executed this instrument, under seal, the day and year first above written.

ADOLPHUS C. BARTLETT. [SEAL.]
THE NORTHERN TRUST COMPANY,
By SOLOMON A. SMITH, *President.*

"Attest:
    H. H. ROCKWELL,
        *Assistant Secretary.*"