Estate of Dell Hinds Higgins, Deceased, Sydney M. Higgins, Executor v. Commissioner.
Estate of Dell Hinds Higgins v. Commissioner
Docket No. 10891.
United States Tax Court
1949 Tax Ct. Memo LEXIS 263; 8 T.C.M. (CCH) 190; T.C.M. (RIA) 49047; February 16, 1949
*263 George H. Stone, Esq., 1004 San Diego Trust & Savings Bldg., San Diego, Calif., and William D. Morrison, Esq., 825 Bank of America Bldg., San Diego 1, Calif., for the petitioner. H. Arlo Melville, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding was brought for a redetermination of a deficiency in estate tax of $29,009.69. The deficiency results from the inclusion in decedent's gross estate of the value of a trust created by decedent on March 24, 1928. The questions presented are whether the transfer of March 24, 1928, was in contemplation of death; whether the transfer was intended to take effect in possession or enjoyment at or after death, within the meaning of Internal Revenue Code, section 811 (c); and whether decedent reserved the power to alter, amend, revoke or terminate the trust, within the meaning of Internal Revenue Code, section 811 (d). The facts were presented by a stipulation of the parties, and evidence adduced at the hearing. Those facts hereinafter appearing which are not from the stipulation are otherwise found from the record. Findings of Fact
*264 Dell Hinds Higgins, the decedent, was born on May 31, 1869, and died March 3, 1945. At the time of her death she was a resident of the County of San Diego, California. Petitioner filed a Federal estate tax return with the collector for the sixth internal revenue collection district of California on May 15, 1945. The return so filed did not disclose a net estate. Decedent and her two sisters had been the beneficiaries of the estate of their parents which included a building in Seattle, Washington. The estate formed a corporation called Hinds Estate, Incorporated, to operate the building, and decedent became vice-president of that corporation at a salary of $70 per month. In 1887 decedent married Albert Edward Higgins. They had two children, a son, Sydney M. Higgins, born March 2, 1889, and a daughter, Helen B. Higgins, born July 17, 1894. Helen was married on April 10, 1917, to Kenneth Kendall. Decedent's first husband died in 1913. Both of their children are still living. Sydney has three children, and Helen has one child. Albert Higgins left no will at the time of his death. Both Sydney and Helen were of age at that time and never claimed any share of the estate which went *265 in its entirety to decedent. In about 1903 decedent almost died of pneumonia. In 1918 she fell and injured her hip, and for the remainder of her life she was not able to walk well. In 1919 decedent met Samuel Harrow, who was employed by a jewelry firm in San Diego. Harrow was not married, and was eight or nine years older than decedent. After knowing Harrow for six years decedent married him on April 9, 1925. Decedent wanted companionship and did not want Harrow to work. After they were married he resigned his position with the jewelry firm and became financially dependent upon decedent. Thereafter, controversies arose relating to money matters. Harrow plagued and harassed decedent for money and caused her to become highly nervous. She became afraid of Harrow, who would take her past cemeteries and hospitals and tell her that that was where he was going to put her. He constantly made demands upon her for money and kept her in an agitated mental condition. She had a constant fear that Harrow was going to cause her death in order to get her money. A few months before March 24, 1928, when decedent created the trust here in question, she went to Paradise Valley Sanitarium at National *266 City, near San Diego, California. She desired to get away from Harrow. On the evening of March 19, 1928, decedent's doctor called Sydney and requested him to come to the sanitarium immediately because Harrow had been coming there frequently and disturbing decedent by making demands upon her for advances of money, and that on that morning decedent had walked downstairs from her room and was sitting out in the front garden when Harrow came; that while he was conversing with her he suddenly stepped off a few feet and threw a bunch of keys at decedent, hitting her in the face. The keys cut her. Sydney went to his mother at once. She was in a very nervous condition and seriously ill. When she was in such a state she cried frequently and her digestion was upset. She was under the care of a physician while she was at the sanitarium. She left the sanitarium within a month or two, having improved rapidly after she created the trust, as hereinafter related. After Sydney and decedent talked the matter over, Sydney went into San Diego and met an attorney whom he knew. He consulted with the attorney on the problem and the attorney suggested the creation of a trust to meet the situation. Numerous *267 conversations were had between decedent and her attorney. Sydney was present at the conferences. Decedent expressed her intention to divest herself of all her property and in such a manner that it would not be subject to Federal estate tax. In preparation of the trust agreement, decedent, Sydney, Helen, and the attorney discussed the making of the trust absolutely irrevocable, in order that there should be no Federal estate tax charge against it, and the attorney prepared the trust under the law then in force and advised decedent that it would not be subject to estate tax. Sydney and Helen were interested in the property and felt that part of it belonged to them since it had been left by their father. Decedent willingly recognized this fact in making provision in the trust for the children. The entire matter was handled expeditiously, and on March 24, 1928, decedent executed the trust instrument. During this time decedent was seriously ill, but she made no remarks of expecting death or being near death. Decedent was a good business woman and did not want to sign the trust since she realized that by doing so she would lose complete control of her property. However, she felt it *268 was the only way to get free from the demands of Harrow and to prevent him from obtaining any part of her property. Decedent transferred everything she owned to the trust, except her car, jewelry, and her salary of $70 per month as president of the Hinds Estate, Incorporated, and $5,418.51 of her savings account with the Southern Trust and Commerce Bank of San Diego, $15,000 being drawn from this account and placed in the trust. Of the balance, $5,000 was withdrawn and paid to Harrow as a property settlement in connection with the divorce action which he was bringing. The Bank of Italy National Trust and Savings Association was named trustee of the trust. Its duties and powers as trustee included the following: "a. The Trustee shall hold and manage the Trust Estate in all respects for the best interests of said Trust Estate and shall invest and reinvest all funds of the Trust Estate in such manner as to produce the largest net income consistent with a high degree of safety; all investments shall be on such security or in such securities as may be lawful for the investment of the funds of savings banks in the State of California; the Trustee shall act with diligence to so hold and *269 manage the Trust Estate and the property and funds of the Trust Estate that the net income of the Trust Estate shall be as large as possible within the limit of the restrictions hereinbefore set forth. * * *
"c. In the event that legal service or legal advice may be necessary in order to preserve or protect the Trust Estate the sole right to select and appoint the attorney or attorneys to represent the Trust Estate shall be in any two of the following persons to wit: (1) The Trustor; (2) Helen B. Kendall; and (3) Sydney M. Higgins; after the death of the Trustor such right to appoint and select such attorney or attorneys shall be in the said Helen B. Kendall and Sydney M. Higgins, or the survivor of them. "f. The Trustee shall pay out of the corpus of the Trust Estate the funeral expenses of the Trustor, upon the death of Trustor, the Trustee shall also pay out of the corpus of the Trust Estate all inheritance and estate taxes owing by the estate of the Trustor or by the beneficiaries herein designated upon the death of Trustor." With respect to the current net income, the trust indenture provided as follows: "5. During the continuance of this trust the net income of the *270 Trust Estate remaining after payment of the costs and expenses of the administration and management of this Trust shall be paid by the Trustee as follows: "A. During the lifetime of the trustor: "a. Seventy-five Dollars ( $75) per month to Helen B. Kendall, or if she be dead to her issue by right of representation. "b. Seventy-five Dollars ( $75) per month to Sydney M. Higgins, or if he be dead to his issue by right of representation. "c. The entire balance of the net income of the Trust Estate to the Trustor. "B. After the death of the Trustor: "In equal shares to Helen B. Kendall and Sydney M. Higgins; in the event of the death of either of said beneficiaries then the share of such beneficiary shall be paid to the issue of such deceased beneficiary by right of representation." Sydney and Helen have each been receiving monthly payments as above provided. By its terms the trust is to terminate upon the death of decedent and both of her children, at which time the corpus is to be distributed one-half to the issue of Sydney and one-half to the issue of Helen by right of representation. Failing issue of either, the entire corpus is to go to the issue of the other. Failing *271 issue of both, the corpus is to go to the heirs at law of Sydney and Helen. The trust is declared to be irrevocable. However, the trustor during her lifetime reserved the right from time to time to appoint a new and different trustee being restricted only to an incorporated trust company authorized to do a trust business in the State of California. In accordance with that reserved power decedent twice changed the trustee. Paragraph 7 of the trust indenture provides as follows: "If it should happen during the continuance of this trust that the net income of the Trust Estate is insufficient to adequately provide for the comfort, wellbeing or education of any of the beneficiaries of this trust, and if such beneficiary has no other means sufficient for the purpose, then upon representation and proof of such facts to a court of competent jurisdiction and upon the order of such court resort may be had to the corpus of the Trust Estate to the extent necessary to relieve the situation, and any amounts so paid out of the corpus of the Trust Estate shall be charged to the respective share of the particular beneficiary receiving such amounts." Decedent's marriage to Harrow was terminated *272 by a final decree of divorce issued July 6, 1929. On August 30, 1929, decedent had her name changed back to Higgins. Early in 1941 decedent desired to alter or amend the trust indenture so as to relieve the trustee of the restrictions contained in subparagraph a of paragraph 3, supra, with respect to investing the trust funds "in such securities as may be lawful for the investment of the funds of savings banks in the State of California." Therefore, decedent had her two children, Sydney and Helen, join her in filing with the Superior Court of the State of California, on February 6, 1941, a document captioned "Complaint for Declaration of Rights under Trust Indenture and for Equitable Relief." The trustee was named defendant. In the complaint it was alleged that decedent "did not and could not anticipate the economic changes that have taken place since March 24, 1928, upon which said date said Trust was established" and as a consequence the income from the restricted investments would probably be so small that an application to the Court for invasion of corpus under paragraph 7, supra, would be required. The trustee-defendant filed an answer on February 25, 1941, in which substantially *273 all of the allegations of fact contained in the complaint were admitted and in which the trustee joined decedent in praying for such decision and judgment as the Court considered proper in the premises. On March 13, 1941, the Court entered its decree changing subparagraph a of paragraph 3 of the trust indenture to read as follows: "a. Trustee shall hold and manage the Trust Estate in all respects for the best interests of said Trust Estate, and shall invest and reinvest all funds of the Trust Estate in such manner as to produce the largest net income consistent with a high degree of safety; all investments hereafter from time to time made by the Trustee shall be in bonds, whether the same be lawful for the investment of funds of savings banks in California or not, and in such preferred and/or common stocks as the Trustee may from time to time select; the Trustee shall act with diligence and shall so hold and manage the trust estate and the property and funds composing the same that the net income of the Trust Estate shall be as large as possible within the limits of the restrictions hereinabove set forth." The form of the court decree entered March 13, 1941, "did not truly express *274 the agreement of the parties" so, on April 19, 1941, decedent again went to court, this time filing a "Notice of Motion to Vacate and Set Aside Judgment and Enter Judgment in Lieu Thereof." On April 21, 1941, the Court entered another decree again changing subparagraph a of paragraph 3 of the trust indenture to read as follows: "a. Trustee shall hold and manage the Trust Estate in all respects for the best interests of said estate, and shall invest and reinvest all funds of the trust estate in such manner as to produce a reasonably high net income, for which purpose the Trustee may make any investments which are of medium or higher grade; all investments hereafter from time to time made by the Trustee shall be in: - bonds, mortgages, and/or trust deed notes, secured by improved real estate (whether the same be lawful for the investment of funds of savings banks in California or not), and/or in such preferred and/or common stocks as the Trustee may select, and within the investment limitations above set forth." On May 27, 1943, decedent petitioned the Court for an order authorizing and directing the trustee to pay to her the sum of $300 per month out of income, if available, otherwise *275 out of corpus. The petition stated in part that the estimated available income of $225 per month for the succeeding twelve months "is insufficient to adequately provide for her comfort and well-being, and that she has no other means of support or other income." No one appeared to oppose the granting of the relief prayed for and on June 11, 1943, the Court entered its order authorizing and directing the trustee to make the payment of $300 per month "paying thereon the net income from said trust and in addition thereto such part of the corpus of the trust estate as may be necessary to make such monthly payments until the further order of this Court." On October 25, 1943, decedent filed with the Court a Petition for Order Allowing Additional Payment from Corpus of Trust. The petition stated in part that in previously petitioning the Court for $300 per month, a payment of $75 per month to her chauffeur had been overlooked so that the net income available to her amounted to only $225 per month; furthermore, in the past sixty days, due to the pending liquidation of Hinds Estate, Incorporated, her salary of $70 per month as vice-president had been discontinued. In praying for an order authorizing *276 and directing the trustee to pay her $445 per month ( $300 plus $75 plus $70 out of income, if available, otherwise out of corpus), decedent stated in her petition as follows: "That the whole of said trust estate was set up out of petitioner's own funds and for her benefit and support; that she is over seventy years of age, and has need of the comforts it can give her as never before." On November 19, 1943, decedent filed with the Court an Amendment to Petition for Order Allowing Additional Payment from Corpus of Trust in which the prayer of her petition filed on October 25, 1943, was amended to read as follows: "WHEREFORE, petitioner prays for an order of Court authorizing and directing the First National Trust & Savings Bank of San Diego, as Trustee, to pay to petitioner or her order as Trustor under said Trust Indenture, or in case of her illness or incompetence, to pay the same for her benefit for her support and maintenance, the sum of Four Hundred and Forty-five ($445.00) Dollars per month, paying the same out of the net income available for said purpose, but if said income is insufficient to pay said sum, then out of the balance of the corpus of said trust estate." *277 On the same day, November 19, 1943, there being no one appearing in opposition to the petition, the Court entered its order authorizing and directing the trustee to make payments as prayed for in the petition of October 25, 1943, as amended on November 19, 1943. Pursuant to the Court orders of June 11, 1943, and November 19, 1943, the trustee paid to decedent out of corpus of the trust the following amounts: 1943 (subsequent to June 11)
$ 624.06
1944
1,175.17
1945 (prior to decedent's death on
March 3)
130.25
Total payments out of corpus
$1,929.48
All of the Court proceedings detailed above were uncontested. Except for the original petition to alter or amend the trust, in which decedent was joined by her two children, decedent alone, through her attorney, filed all subsequent petitions, although the names of the children appear in the captions. Neither of the children ever requested an increase in their monthly payments of $75 each from the trust; nor did they ever petition the Court for payments out of corpus. No corpus was ever used for the benefit of either of the two children. Subsequent to the death of decedent, there was paid out of the corpus of *278 the trust estate the following items: 4/10/45
Bradley-Wollman Mortuary fu-
neral expenses
$ 574.94
8/22/45
W. S. Heller, County Treas-
urer California State Inherit-
ance Tax in matter of Estate
of Dell Hinds Higgins, de-
ceased, per order of fixing in-
heritance Tax dated 8-1-45
3,262.44 In the Federal estate tax return the funeral expenses in the amount of $574.94 were included in the total deductions claimed of $2,477.38. The property comprising the trust estate on the date of decedent's death consisted of bonds, preferred and common stocks, and $1,539.81 in cash, making an aggregate total of $188,302.40. At the time of her death decedent owned only her car, her jewelry, and cash in the amount of $1,980.27. Decedent's last will, dated April 8, 1940, reads as follows: "I give to my daughter HELEN B. KENDALL all my clothes, ornaments, everything in my home, except the jewelry I have already willed to others, - for her to take and keep as her own. All my things in Helen's home are to be hers also." Opinion As to the portion of the trust from which decedent reserved the right to the income for her life, there can now be no doubt of *279 the includibility in the gross estate, notwithstanding that the trust was created prior to 1931. Commissioner v. Estate of Church, 335 U.S. 632 (January 17, 1949). Inclusion of the balance is required under the principle that decedent's right to have the corpus invaded - an opportunity of which she actually availed herself on several occasions - "postponed the complete and ultimate transfer of the trust corpus until or after the decedent's death," under the principle of such cases as Estate of Virginia H. West, 9 T.C. 736, 739. See also Estate of Norma P. Durant, 41 B.T.A. 462. And whatever doubt there may have been that such an invasion affecting only a part of the estate might be too insignificant to justify taxing all of it must now yield to the principle enunciated in Estate of Spiegel v. Commissioner, 335 U.S. 701 (January 17, 1949). Our conclusion that the trust is taxable as part of decedent's estate for the reasons given eliminates the necessity of considering the alernative contention of a transfer in contemplation of death. Decision will be entered for the respondent.