GLADYS CHEESMAN EVANS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60640. Filed June 30, 1958.

*J. G. Korner, Jr., Esq., Stanley Worth, Esq.*, and *Jules G. Korner, III, Esq.*, for the petitioner.

*Frank C. Conley, Esq.*, for the respondent.

The Commissioner determined deficiencies in income tax of the petitioner as follows:

| | |
|---|---|
| 1950 | $36, 303. 24 |
| 1951 | 33, 228. 37 |
| 1952 | 26, 655. 48 |
| 1953 | 18, 643. 55 |
| 1954 | 10, 423. 77 |

The only question presented is whether respondent properly included in petitioner's taxable income for the taxable years dividends paid to a trust of which she was at one time life beneficiary, notwithstanding the alleged fact that prior to such payments she had sold and assigned all of her interests under such trust to her husband who was also trustee of the trust. The parties have stipulated that, due to a mathematical error, the petitioner's 1954 individual income tax return erroneously stated the dividend credit as $808.34 instead of the correct figure of $751.36, and that this error may be corrected in a Rule 50 computation.

### FINDINGS OF FACT.

Some of the facts have been stipulated. The stipulation and exhibits annexed thereto are incorporated herein by this reference.

The petitioner is a resident of Denver, Colorado. She filed her individual income tax returns for the years 1950 and 1951 with the collector of internal revenue for the district of Colorado and for the years 1952, 1953, and 1954 with the district director of internal revenue at Denver, Colorado. She was born on July 9, 1887, and has been married to John Evans for nearly 50 years. They are the

parents of three children and were the grandparents of nine grandchildren in 1950. Petitioner's husband is president of a Denver bank and chairman of the board of directors of the Denver & Rio Grande Western Railroad Company and of a Denver trust company. Petitioner and her husband are devoted to each other. They live in a large home in Denver and each contributes to its considerable expenses. Petitioner is advised by her husband on all business matters and justifiably has confidence in his ability and integrity.

Prior to September 14, 1920, petitioner and her mother, Alice Foster Cheesman (who was born in 1851), owned in equal shares all of the outstanding stock of the Alice Foster Cheesman Realty Company, a Colorado corporation, hereinafter referred to as the corporation, being 1,000 shares of capital stock. They owned 996 of these shares directly. They were also the beneficial owners of the remaining 4 outstanding shares which were registered in the names of others as directors' qualifying shares. On September 14, 1920, petitioner and her mother executed a trust indenture creating an irrevocable trust, hereinafter referred to as the trust, of which petitioner's husband, John Evans, was trustee. In and by this trust indenture they conveyed to the trustee all of their right, title, and interest in all of their shares of stock in the corporation for the uses and purposes set out in the trust indenture which provided *inter alia:*

(1) The net income of the trust should be paid to Alice Foster Cheesman (the mother) for so long as she lived;

(2) After the death of said Alice Foster Cheesman the net income of the trust should be paid to the petitioner for so long as she survived Alice Foster Cheesman;

(3) Upon the death of petitioner the income of the trust should be paid to the three children of petitioner and their issue, per stirpes, during the lives of her said three children and for 21 years after the death of the last survivor of said children;

(4) Upon the termination of the trust, the trust assets were to be paid over to the remaindermen who were the issue of petitioner's children, per stirpes.

(5) In the event petitioner should survive all the remaindermen provided by the trust, the trust estate should revert to petitioner.

The trustee was given all the usual powers of management and control of the trust property and full, absolute, complete, and sole right, power, and authority to exercise all the rights or powers in connection with or with respect to any funds and property of the trust estate.

Pursuant to the provisions of the trust indenture, the stock comprising the corpus of the trust was delivered to John Evans as trustee and the trust became effective on December 14, 1920. In accordance with the terms of the trust indenture, the net income of the trust was paid over to the petitioner's mother until her death on January 7, 1923, and thereafter and until December 1, 1950, to the petitioner.

Subsequent to the Supreme Court decisions in the cases of *Commissioner* v. *Estate of Church*, 335 U. S. 632 (1949), and *Estate of Spiegel* v. *Commissioner*, 335 U. S. 701 (1949), the petitioner's personal estate was examined by her counsel to ascertain how it would be affected by the holdings in these cases. The petitioner thereafter on recommendation of counsel gratuitously disposed of her interests in two other separate trusts pursuant to the provisions of the Technical Changes Act of 1949. Petitioner had a remote reversionary interest in the first of these trusts. In the second she had a contingent life interest as well as a reversionary interest, but the corpus of that trust was not large and the value of petitioner's interests therein was approximately $4,000. Petitioner's counsel were particularly concerned with the trust of September 14, 1920, since the corpus of that trust had considerable value and the full amount of that value appeared to be includible for estate tax purposes in petitioner's gross estate under the rationale of those Supreme Court opinions.

Since petitioner's interest in this trust had considerable value and petitioner had need of funds, as described below, petitioner and her advisers did not wish to effect a gratuitous disposition of this interest. Her personal estate had little liquidity and for a number of years her expenditures had exceeded her income. She was in the habit of making gifts to her children and grandchildren, and had done so frequently for many years. By 1950 the only assets of consequence remaining in her estate were the following: (a) 52 per cent of the outstanding stock of the Walter S. Cheesman Realty Co., a Denver real estate company organized by petitioner's father; (b) a life interest in 48 per cent of the stock of this realty company under a testamentary trust established by her father's will; (c) her home where she and her husband had been living since about 1910; and (d) her life interest in the income of the trust involved herein. Petitioner desired money for certain specific projects of her own and also desired an assured source of income for the future. She felt that the homes of her two younger children were inadequate for their large families, and she wanted to give them financial assistance in acquiring larger homes. She also wanted to make repairs and improvements to her own home.

Of the four large assets remaining to petitioner in 1950 neither she nor her husband wanted to part with their home, and the testamentary trust of her father, under which she had a life interest in 48 per cent of the stock of the Walter S. Cheesman Realty Co., contained a provision against alienation so that petitioner could not dispose of this asset.

Petitioner's advisers considered the idea of petitioner's selling her life estate and her reversionary interest in the trust, since this interest was affected by the *Church* and *Spiegel* decisions, *supra*. Beginning in August 1950 the idea was discussed among her counsel, her husband, and her son-in-law who was the operating head of the corporation. It was the consensus of this group that she should dispose of her entire interest in the trust, but that she could not afford to give it away. If she could sell it she would be rid of it for estate tax purposes and at the same time would obtain amounts of cash which she desired to carry out her own projects. Her husband offered to purchase her life estate and her reversionary interest in the trust, but, since he was not only her husband but also the sole trustee of the trust, he refused to have anything to do with arranging the price to be paid for her interest. This was left up to petitioner's son-in-law and her counsel.

The son-in-law and counsel attempted to arrive at a selling price which would be advantageous to her and at the same time would be fair and reasonable to all parties concerned. They determined that the proper way to value her life estate was to treat it as the right to receive income for the period of her life. The sole income of the trust came from the dividends declared upon the stock of the corporation. No such dividends had been paid from 1937 until 1950. From 1937 until 1946 earnings had been small. The principal income-producing asset of the corporation was real estate covering about half a city block located near the City Hall and State Capitol Building in Denver, and improved by 1-story buildings rented for use of shops and service enterprises. In the years 1946 through 1949, when earnings improved, the corporation accumulated its resources in order to pay for an extensive modernization and rebuilding program which its management considered advisable. The corporation did spend about $67,000 in improvements to the property during the period 1948 through early 1953. At the advent of the Korean War in 1950 the corporation decided to go back on a dividend-paying basis, particularly in view of the good earnings of 1946 and later years, and also because a large-scale improvement program did not seem feasible. The payment of the dividends was resumed in January 1950. The corporation had a dividends-paid record and an accumulated earned surplus as of December 31 of each year from 1920 to 1954, inclusive, as follows:

| Year | Dividends paid | Earned surplus December 31 | |
|---|---|---|---|
| | | Cash basis | Accrual basis |
| 1920 | | $3,829.13 | |
| 1921 | $11,250 | 4,661.90 | |
| 1922 | 18,000 | 5,418.49 | |
| 1923 | | 27,808.42 | |
| 1924 | | 52,120.71 | |
| 1925 | | 75,577.18 | |
| 1926 | 6,000 | 84,266.37 | |
| 1927 | 6,000 | 89,777.60 | |
| 1928 | 12,000 | 94,331.66 | |
| 1929 | 12,000 | 94,563.16 | |
| 1930 | 6,500 | 97,772.37 | |
| 1931 | 10,000 | 92,919.32 | |
| 1932 | 2,000 | 89,167.08 | |
| 1933 | | 82,029.03 | |
| 1934 | | 74,123.34 | $61,548.47 |
| 1935 | | | 57,062.38 |
| 1936 | | | 60,163.68 |
| 1937 | 3,000 | | 62,203.77 |
| 1938 | | | 67,839.45 |
| 1939 | | | 74,824.76 |
| 1940 | | | 81,839.21 |
| 1941 | | | 88,498.71 |
| 1942 | | | 91,475.78 |
| 1943 | | | 92,506.90 |
| 1944 | | | 96,412.05 |
| 1945 | | | 101,007.58 |
| 1946 | | | 113,282.68 |
| 1947 | | | 132,461.79 |
| 1948 | | | 152,583.64 |
| 1949 | | | 181,425.80 |
| 1950 | 57,500 | | 158,758.77 |
| 1951 | 45,000 | | 140,136.05 |
| 1952 | 35,000 | | 124,977.23 |
| 1953 | 25,000 | | 120,983.37 |
| 1954 | 15,000 | | 126,352.20 |

The balance sheets of the Alice Foster Cheesman Realty Company for the taxable years 1950 to 1954, inclusive, and for the 5 preceding years show the following:

| Year ended December 31 | Current assets | Fixed assets | Total assets | Current liabilities |
|---|---|---|---|---|
| 1945 | $54,417.38 | $553,669.89 | $608,349.02 | $62,441.44 |
| 1946 | 69,701.39 | 580,967.09 | 653,490.85 | 94,408.17 |
| 1947 | 43,949.00 | 586,066.19 | 631,821.97 | 53,560.18 |
| 1948 | 34,268.03 | 599,184.54 | 633,990.04 | 35,106.40 |
| 1949 | 76,300.28 | 601,636.96 | 682,508.35 | 54,407.55 |
| 1950 | 116,958.26 | 535,454.60 | 654,922.38 | 49,963.81 |
| 1951 | 61,604.88 | 571,281.46 | 633,499.70 | 46,638.65 |
| 1952 | 33,179.85 | 617,873.35 | 654,545.20 | 85,567.97 |
| 1953 | 50,510.44 | 630,079.48 | 683,195.79 | 117,232.32 |
| 1954 | 70,067.42 | 584,838.69 | 655,881.79 | 85,529.59 |

Petitioner's advisers determined that her life estate in the trust was worth about $215,000. They arrived at this figure by taking the average net yearly income, after taxes, of the corporation for the 5 years preceding 1950 and multiplying this by her life expectancy which was 12.69 years according to actuarial tables of the Metropolitan Life Insurance Company. It was suggested by petitioner's advisers that a purchase price for this equitable life interest advantageous to petitioner as to amount and method of payment would be an agreement by the vendee to pay petitioner $50,000 at the time of sale, $40,000 in the subsequent year, $30,000 in the second

year, $20,000 in the third year, and $10,000 a year thereafter during her lifetime. According to the method used by her advisers to evaluate her life interest under the trust, the value of such a contract to petitioner would be in their opinion approximately $240,000. Both petitioner and her husband agreed to this suggestion and were satisfied with the valuation placed upon the life interest of petitioner and with the fairness and adequacy of the consideration to be paid for it.

On December 1, 1950, the petitioner, who at that time was 63 years of age, executed and delivered to her husband, John Evans, a deed in which it is recited in part as follows:

WHEREAS, Gladys Cheesman Evans (the Grantor herein) is now the owner of an equitable estate and interest in property, namely the right for the duration of her life to receive all of the income of the said trust, together with the reversionary interest in said trust in the event she should survive all remaindermen provided for in said trust; and

WHEREAS, at the present date there are in being twelve children and grandchildren of Gladys Cheesman Evans, who are the present remaindermen in being; and

WHEREAS, there are no restrictions or prohibitions either under the provisions of the Trust Agreement or under existing law of Colorado upon the right of the Grantor to transfer, convey and assign her right, interest and estate in and under the said Trust; and

WHEREAS, the said Grantor desires to dispose of all of her right, title and interest in and under said "Trust Settlement Agreement" for a full and adequate consideration; and

WHEREAS, the Grantee has offered to purchase the said life estate and the said reversionary interest of the Grantor on the basis of annual payments, said payments, in each instance, being contingent upon the Grantor's being alive on the respective dates, namely:

$50,000 on December 1, 1950
$40,000 on December 1, 1951
$30,000 on December 1, 1952
$20,000 on December 1, 1953
$10,000 on December 1 of each succeeding year during the Grantor's lifetime

which said offer has been accepted by the Grantor; and

WHEREAS, computations have been made by usual methods of valuation, including the use of tables of mortality and actuarial principles, pursuant to regulations prescribed by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury, to determine the basis in the hands of the Grantor of the property interest and estate herein conveyed, transferred and assigned to the Grantee, and such computations show that the said basis in the hands of the Grantor is not less than $217,725.93; and

WHEREAS, computations have been made by similar methods and principles of valuation to determine the present fair market price or value of the Grantor's reversionary interest in the trust estate, and such computations show that such present fair market price or value is negligible and in all events much less than 5% of the value of the trust property; and

WHEREAS, neither the Grantor's selling price nor the Grantee's cost hereunder is susceptible of definite ascertainment until the death of the Grantor, and, accordingly, the realization of capital gain, if any, to the Grantor must necessarily await the recovery of her said basis;

The "deed" thereupon provided:

Now, THEREFORE, in consideration of the premises, and the sum of Ten ($10) Dollars, paid by the Grantee to the Grantor, receipt whereof is hereby acknowledged, the Grantor has granted, conveyed, sold, transferred, assigned, set over, relinquished and delivered, and by these presents does grant, convey, sell, transfer, assign, set over, relinquish and deliver to John Evans, the Grantee herein, his heirs, executors, administrators and assigns, all of the right, title, interest, property and estate owned by her, or to which she can or may become entitled, in the trust estate created and existing under and pursuant to the "Trust Settlement Agreement" executed on September 14, 1920, by Alice Foster Cheesman and Gladys Cheesman Evans, to which reference has been made above herein and which is by such reference made a part hereof,

In the taxable years the petitioner received the following payments from her husband on account of the purchase price:

| 1950 | $50,000 |
|---|---|
| 1951 | 40,000 |
| 1952 | 30,000 |
| 1953 | 20,000 |
| 1954 | 10,000 |

These payments were made by him shortly after his receipt as life tenant of distributions by the trust, representing dividends paid to the trust by the corporation in amounts exceeding the payments made to petitioner. The payments received by petitioner from her husband were credited by her against her unrecovered cost basis in the trust, thereby reducing that basis. By the end of the year 1954 she had not yet recovered her cost basis in the life estate sold by her to her husband. In each year her husband recorded as an addition to his cost the contract payment which he was required to make to petitioner. To the extent that he received distributions from the trust in any year in excess of his obligation under the contract of sale, such excess was reported in his individual Federal income tax returns as income. All acts by and on behalf of petitioner and her husband subsequent to the execution of the above-quoted deed were consistent with their intention that ownership of petitioner's equitable life interest was transferred thereby by petitioner.

During the years 1951–1954 petitioner made gifts to her children and grandchildren in a total amount of approximately $74,000, of which approximately $50,000 constituted gifts to her two younger children for the purpose of making it possible for them to acquire larger homes. She also made improvements and repairs to her own residence, including the installation of an elevator at a cost of approximately $10,000.

The transaction of December 1, 1950, between petitioner and her husband was what it purported to be. Petitioner in good faith intended to sell, and her husband in good faith intended to buy, her entire interest in the Alice Foster Cheesman trust; the parties to the transaction intended that thereafter the husband should be the sole

owner of petitioner's interest in the trust, and that he alone should be entitled to any distributions of trust income which might be made; and the parties intended that thereafter petitioner should be entitled to the payments as set forth in the deed of December 1, 1950, and no more, and that such payments to petitioner from her husband were not dependent upon any condition other than that petitioner be alive, but were payable at all events during petitioner's lifetime. After this sale petitioner had no control over the assets or income of the trust and no interest therein.

OPINION.

KERN, *Judge:* In this case the respondent has ignored the "deed" executed by petitioner on December 1, 1950, whereby petitioner conveyed to her husband all of her "right, title, interest, property and estate owned by her" in the trust here involved, and has included in her taxable income the full amounts of the dividends received by the trust subsequent to the execution of the "deed," it being his determination that such amounts are "includible in [petitioner's] gross income * * * under Section 22 (a) of the Internal Revenue Code of 1939 as income from the trust created on September 14, 1920."

The question before us is whether in reality petitioner effectively transferred by such "deed" ownership of her equitable life interest under the trust so that the transfer is valid "for tax purposes." If she did, it follows that the income attributable to such life interest is not taxable as such to petitioner, and respondent has erred in his determination of deficiencies.

The respondent's argument may be fairly stated by the following quotations from his brief: "The purported sale was merely a formal ritualistic scheme without substance which did not materially change the economic position of either member of the family group. The true motive behind the transaction in question was in finality nothing more than an attempt to avoid the payment of taxes." "[T]he facts of record which are controlling for tax purposes clearly show that the petitioner was in no better financial position after the sale than she was before." "The petitioner herein was in no position to deal at arms length with her husband." "[T]he petitioner entered into the purported sale for the sole purpose of complying with her husband's personal desires. There existed no adverse economic interest between the parties to the transaction." She could have obtained funds with which "to provide financial assistance to her two children and to make certain improvements in her home * * * without disposing of her valuable life estate. For example, her husband, as trustee, had the complete authority to declare a dividend from the Realty Company payable to the trust, and in turn could have made a distribution to his wife from the trust of which he was the trustee."

"[D]ividends had not been declared prior to the purported transaction because petitioner had a large income from other sources * * *." The husband's "true purpose in seeking legal advice was merely a sham by which he could show compliance with legal formalities. There was no business purpose involved." "[I]t is not too presumptuous to assume that at any time Mr. Evans wished he could negotiate the necessary legal formalities and have the purported sale revoked." There was no "attempt on the part of the petitioner or her husband to obtain an accurate evaluation of her life interest determined" and "the amount of the consideration was based upon how much the petitioner and her husband desired to receive tax free." In conclusion, respondent submits "that as a matter of law the character of the purported sale and the true purpose of the parties amounted to nothing more than an attempt to circumvent the payment of taxes by the petitioner and her husband."

In view of our concept of what the crucial issue is in this case, that is, whether petitioner transferred ownership of her equitable life interest to her husband in 1950, we are somewhat confused by the following paragraph in respondent's reply brief:

In form the transaction would appear to be a "sale" but in actuality the taxpayer merely exchanged a life estate for an annuity, paying amounts she could just as well have received as a life tenant. In other words, it was simply an exchange of one kind of contingent interest for a very similar kind of contingent interest. What the petitioner did was to exchange her right to receive amounts which it was within her husband's power to fix for his promise to pay her amounts which he could have paid her had there been no sale at all. The petitioner's rights both before and after the transaction were contingent upon the same event.

By insisting that "the taxpayer * * * exchanged a life estate for an annuity," respondent appears to be conceding that the ownership of the equitable life estate was effected by transfer to her husband since, obviously, such a transfer could be accomplished by an "exchange" as well as by a "sale."

We will agree with respondent that the transaction here in question requires our closest scrutiny in ascertaining whether the parties actually did what they purported to do. It was not an "arms length" transaction as that phrase is usually used; it was a transaction between husband and wife; and, furthermore, it was a transaction between beneficiary and fiduciary. However, respondent himself recognizes that, while these circumstances require a close scrutiny of the transaction, none of them ipso facto negates its validity.

We have given to this transaction the careful scrutiny required. In our opinion, petitioner's decision to make the transfer here in question was caused by her desire to escape the impact of *Commissioner* v. *Estate of Church*, 335 U. S. 632, and *Estate of Spiegel* v. *Commissioner*, 335 U. S. 701, and at the same time realize money by disposing of her

interests under the trust. With regard to the mechanics used, it is obvious that petitioner's advisers made careful plans to minimize her taxes. For example, it was contemplated that the payments to be received by petitioner were to be of such a character that they would constitute taxable income to petitioner only when and to the extent that they were in excess of her basis with regard to the life estate which she conveyed. However, the mechanics of the disposition of petitioner's interests under the trust, although carefully and cleverly conceived, were incidents in the accomplishment of the principal objective of the transaction, that is, the transfer of ownership of all of petitioner's rights under the trust in return for a consideration which petitioner and her advisers deemed adequate. We are convinced that petitioner's intention [1] was to transfer her ownership of such rights to her husband. That intention was effected by the deed in question which transferred complete ownership to her husband without qualification or condition.

Respondent stresses in his argument the inadequacy of the consideration received by petitioner and the fiduciary and familial relationship to her of the transferee. His only witness testified that according to an actuarial computation, which, in his opinion, was superior to that used by petitioner's advisers, her life interest in the trust was worth $215,000 and the annuity contract which she received from her husband was worth $180,000. These matters might be material in a suit in equity which petitioner might bring to avoid the transaction. However, no such suit has been brought and at the trial of this case (some 7 years after the execution of the deed) both petitioner and her husband testified and petitioner indicated in no way that she felt that she had been overreached in the transaction.[2] The only person who appears to be aggrieved by the transaction is the Commissioner of Internal Revenue.

The reason for his grievance is apparent. The petitioner had a life interest under a trust of which her husband is trustee. The corpus of the trust consisted of stock of a corporation of which her husband was a director and, as trustee, was the sole stockholder. If dividends were declared by the corporation they would be distributable to petitioner as life beneficiary and taxable to her. By transferring ownership of her equitable life estate to her husband in return for his undertaking to make certain definite annual payments to her during her life, she did not expect to be taxable upon such payments until they exceed her basis with regard to the life estate transferred, even though the payments are made to her from dividends declared by the corpora-

[1] The fact that this intention of petitioner was formed by her in reliance upon the advice of her husband and others we consider immaterial.

[2] In this connection we note that petitioner and her husband appeared to be devoted to each other, and we have no reason to believe that her husband had any intention to deal unfairly with his wife.

tion and paid by the trust to her husband.' This grievance may warrant respondent in making recommendations for congressional action, but it does not justify us in reaching the result desired by respondent by ignoring as unreal and a sham a transaction which in our opinion constituted in substance a valid transfer of ownership of petitioner's life interest under the trust here in question.

Upon the issue submitted to us for decision, we decide in favor of the petitioner.

*Decision will be entered under Rule 50.*