MAY T. HROBON, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 91844, 91845, 93682, 93683.   Filed January 14, 1964.

---

[1] Proceedings of the following petitioners are consolidated herewith: May T. Hrobon, docket Nos. 91845, 93682, and Emil M. Hrobon and Maxine Hrobon, docket No. 93683.

*J. Bruce Donaldson*, for the petitioners.

*Henry T. Nicholas, Jr.*, and *Thomas J. Young*, for the respondent.

478

480

488

492

OPINION

The question upon the answer to which all issues here involved hinge, is what the parties intended and what was actually accomplished by the transaction between May and Emil evidenced by the agreement of November 9, 1955. In tax matters we must look to substance rather than form alone, *Helvering* v. *Clifford*, 309 U.S. 331 (1940), and the essence of the transaction is to be determined not by the subtleties of draftsmanship but by its total effect. *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260 (1958). The transaction here involved seems to us to be one to which that rule is peculiarly applicable.

*Docket Nos. 91844 and 93682—Capital Gain* v. *Ordinary Income*

Petitioner contends that the transaction was a sale by May of her entire life interest in the Clay M. Thomas trust to Emil for a consideration of $800,000, constituting a capital transaction the gain from which is taxable as long-term capital gain. Respondent deter-

mined and argues primarily that the transaction resulted in a gift of 40 percent of the income of the trust and 100 percent of all terminal rights the life tenant might have in the trust by May to Emil with a retention by May of 60 percent of the income of the trust, which is taxable to her as ordinary income.

We do not question that the transaction resulted in a transfer of May's equitable interest in the corpus of the trust property to Emil and that this was what it was intended to do. The basic instrument entitled "Agreement," dated November 9, 1955, and signed by both May and Emil would clearly so operate and it was found to have that effect by the courts of Ohio in proceedings which could hardly be said to be uncontested. The question of the validity of the assignment is one of local law. *Blair* v. *Commissioner*, 300 U.S. 5 (1937). And we also know from the *Blair* case that a person who is entitled for life to the net income from property held in trust is the owner of an equitable interest in the corpus of the property, and that such interest is "property" alienable like any other property. And, prior to the Supreme Court decision in *Commissioner* v. *P. G. Lake, Inc.*, *supra* (decided April 14, 1958, rehearing denied May 19, 1958), at least, if the entire interest of the life beneficiary in the income and the trust corpus was sold in an arm's-length transaction for a lump-sum consideration, the transaction was considered to be a capital transaction and the consideration received by the transferor was held to be capital gain. *Bell's Estate* v. *Commissioner*, 137 F. 2d 454 (C.A. 8, 1943), reversing 46 B.T.A. 484 (1942); *McAllister* v. *Commissioner*, 157 F. 2d 235 (C.A. 2, 1946), reversing 5 T.C. 714 (1945). See also *Gladys Cheesman Evans*, 30 T.C. 798 (1958), which was decided at about the same time as the *Lake* case.

Petitioners claim this case falls squarely within the ambit of the cases last cited above and is controlled by them. However, a close analysis of the evidence in this case to determine just what the complete agreement between May and Emil was, as viewed in the light of their actions as well as their testimony, what the purpose of the transaction was, and what the end result was, convinces us that this transaction is not controlled by the cases last cited above. And we also think this case should be examined under the principle with respect to capital gains established by the Supreme Court in the *Lake* case, and *Commissioner* v. *Gillette Motor Transport Co.*, 364 U.S. 130 (1960).

First, we must determine what the complete agreement, as adopted and acted upon by Emil and May, actually was. Was it the basic agreement with only Exhibit A attached, which made no reference to a dollar amount but gave May only a percentage of the income? Or was this modified by the "payment contract" which recited a purchase price of $800,000 payable $60,000 per year?

Three of petitioners' witnesses, being their accountant, Knospe, their local attorney, Tuttle, and a tax attorney from Detroit consulted by the accountant, Raymond, testified that it was their understanding of the oral agreement between May and Emil that Knospe was to arrive at a fair market value for May's interest in the trust and that this was to become the purchase price for May's entire interest in the trust. Emil testified that the lump-sum figure was to be the purchase price. At the time of this trial, when May had received a large part of the $800,000 figure arrived at by Knospe, it would appear to have been to Emil's interest to so testify, but the evidence indicates a considerable reluctance on the part of anyone to exhibit the payment contract prior to that time. May also testified to that effect but her testimony indicates considerably more reliance on the right to receive 60 percent of the trust distributions than on the right to receive $800,000.[3]

The tax attorney had no firsthand information on this—he was simply asked by the accountant to prepare a payment schedule using an $800,000 total price. We have no doubt that he prepared the payment contract quoted in our findings and delivered it to the accountant during the latter part of 1955, but if he was aware that both Exhibit A, which called for payment of 60 percent of the net distributions from the trust to May with no mention of dollar amounts, and the payment contract, which used dollar amounts only and made no reference to a percentage, were supposed to be a part of the complete agreement, it seems strange that some mention of Exhibit A was not made in the payment contract.

It also seems strange that if a purchase price of a fixed dollar amount was to be used, why some specific reference to such fact was not made in the basic agreement or Exhibit A attached thereto. On its face this document was a complete contract in itself. Furthermore, if the payment contract was later adopted as a part of the agreement it seems strange that in a transaction of this magnitude the entire agreement should not have been revised or tied together in some manner that there could be no doubt about it.

The evidence reveals some confusion as to what happened to the payment contract after it was delivered to the accountant. The accountant's testimony indicates that he gave it to either Tuttle or Emil. Tuttle's testimony indicates that he either received it from the accountant and delivered it to Emil or received a copy thereof signed by Emil which he delivered to May. Apparently no one observed Emil sign the payment contract and there is no suggestion that May signed

---

[3] Unfortunately, May's testimony was taken by deposition and the Court did not have the opportunity to observe her as a witness. A reading of her deposition indicates such a reluctance on her part to give complete answers to the questions asked that the deposition is as much that of her attorney as of May herself, and cannot be given too much weight.

it, which also seems a little odd in the light of the fact that there apparently was a contract which had previously been signed by both Emil and May which, with Exhibit A attached, was complete in itself and could be considered in conflict with the payment contract. The payment contract does not appear to have been exhibited to the Ohio courts. Petitioners' explanation of this is that in the various proceedings which eventually confirmed the transfer of May's interest to Emil the Ohio courts were interested only in whether Emil had an interest in the property which would entitle him to sue the trustee, which was evidenced by the basic agreement, and the purchase price for which he acquired the property was of no interest to the local courts. There is some conflict in the evidence as to whether agents of the Internal Revenue Service were advised of the payment contract in either 1958 or 1959 when May's returns for the years preceding the years here involved were under investigation. However, a signed copy of the payment contract could not be produced at the time of trial of this case and was not produced until May's deposition was taken several months after the trial had been concluded.

On May's income tax return for 1956, which was prepared by the accountant, this transaction was reported on Schedule D as "Life interest in testamentary trust created by will of Clay M. Thomas," gross sales price, "indeterminate"; reporting $117,681.16 as having been received during the calendar year 1956 as return of capital against her basis, although the amount of her basis was not stated. An "indeterminate" sales price is inconsistent with a fixed sales price of $800,000. Nothing was shown on May's returns for 1957–59 with respect to this transaction. Emil's returns for 1956 and 1957, also prepared by the same accountant, reported the entire amount distributed by the trust and, after deducting certain legal fees and expenses, deducted from the net amount $117,681.16 identified as "60% paid to May T. Hrobon (per agreement)." This also seems more consistent with the payment schedule set out in Exhibit A than with the terms of the payment contract.

The only purposes of this transaction, aside from the tax considerations, would seem to be to place title to the life interest in the trust in Emil so he could bring actions against the trustee in his own capacity rather than having to bring them in May's name, and to give Emil the right to claim the value of the accumulated income account, the float, and the goodwill of the business upon termination of the trust at May's death if he survived her. We recognize that May was probably tired of the continuous litigation with respect to the trust, but doubt that this was the dominant reason for the transfer. May appears to have had numerous attorneys and Emil to insulate her against the rigors of this litigation; the evidence indicates that she testified only once throughout the entire series of cases tried in the local courts.

It seems more likely that May was interested only in receiving enough income from the trust to support herself for the rest of her life and that for some reason she was willing to let Emil have the rest of the income as well as any terminal benefits which might inure to the owner of the life interest on May's death. This is understandable when it is realized that May had apparently been giving Emil 50 percent of the income of the trust prior to this transaction,[4] and it was unlikely that May, personally, would benefit from any of the terminal rights which would probably not mature until her death. But there appears to be no reason why May would be willing to limit her income to a fixed amount which, in all likelihood, she could recover only out of the current distributions of the trust, which she had a right to in any event. There is no evidence that Emil could have paid either the minimum annual amounts or any unpaid balance of the $800,000 in the event the trust did not produce sufficient income to meet the annual payments or in the event May died before the $800,000 was paid. An additional reason to make us doubt that Emil and May ever adopted the payment contract as a binding part of the entire agreement is the fact, of which they had been advised, that if the payment contract was adopted and May died shortly thereafter Emil would have been obligated to her estate for up to $800,000 and the value of this claim would have been an asset in May's estate for estate tax purposes, which would not have been the case had she retained merely a life interest in the trust.

With respect to May's economic position, the end result of the transaction was simply to give May 60 percent of the income to which she had been entitled, prior to the transaction, without running the risk of having her payments to Emil disallowed as a deduction for tax purposes.[5] Emil became entitled to 40 percent of the trust distributions, plus any terminal rights the life beneficiary might have in the trust, rather than the 50 percent of the trust distributions he had been receiving from May. The transaction effected no substantial change in the economics of the situation as between May and Emil except with respect to the terminal rights.

In the light of the above we are not convinced that the payment contract ever became a part of the agreement between Emil and May. In our opinion, the agreement they carried out was that contained in the agreement dated November 9 with Exhibit A attached, with the payment contract being held for production only when and if the income tax problem became more pressing than the estate tax problem. In our opinion the realities of the transaction were that May transferred her equitable interest in the trust corpus, all terminal

---

[4] The evidence with respect to this arrangement was vague and if there was any written agreement with respect thereto, it was not offered in evidence.

[5] Respondent had attacked these deductions in her prior years' returns.

rights the owner of the life interest might have in the trust estate, and the right to receive 40 percent of the distributions of the trust to Emil, but reserved 60 percent of the net trust distributions for herself. This reservation of income to herself was not consideration for the sale or exchange of a capital asset; it was something she was entitled to all along. While under State law Emil became entitled to receive all the distributions from the trust, in economic substance and for tax purposes he was merely a conduit of 60 percent of the net trust distributions to May.

We think this case is distinguishable from *Bell's Estate* v. *Commissioner*, *McAllister* v. *Commissioner*, and *Gladys Cheesman Evans*, all *supra*. In the first two cases the transferor received a lump-sum consideration, and in the latter the transferor was to receive annual payments in fixed amounts regardless of the income of the trust. In none of them was the compensation to be paid dependent upon, or determined as a percentage of, the trust income, nor was the transferor required to look to the trust for production of his compensation. We do not consider *Estate of Robert J. Cuddihy*, 32 T.C. 1171 (1959), which was an estate tax case, apposite, but the same distinctions would be applicable.

We conclude that the trust distributions received by May were not taxable to Emil but were taxable as ordinary income to May. Even if the amounts received by May were found to be consideration received for transfer of her interests in the trust, we believe the principle established in the recent Supreme Court decisions in *Commissioner* v. *P. G. Lake, Inc.*, and *Commissioner* v. *Gillette Motor Transport Co.*, both *supra*, would support our conclusion here.

In *Commissioner* v. *P. G. Lake, Inc.*, *supra*, the question was whether the consideration received for the assignment of an oil payment right was taxable as ordinary income or capital gain. The Supreme Court recognized that under Texas law oil payments were considered interests in land but held that the consideration received for the oil payment was taxable as ordinary income because it found that the transaction did not fall within the intended purpose of the capital gains provisions of the Internal Revenue Code, which were said to be "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." The Court found no conversion of a capital investment but found that the lump-sum consideration was a substitute for what would otherwise be received at a future time as ordinary income and was therefore taxable as ordinary income.

In *Commissioner* v. *Gillette Motor Transport Co.*, *supra*, the question was whether a sum received by a taxpayer from the United States as compensation for the temporary taking by the Government

of its business facilities during World War II represented ordinary income or capital gain. Looking to the precise nature of the property taken and again referring to the purpose for the capital gains provisions of the Code, the Court found that the property right taken for which the compensation was awarded was the right to use the transportation facilities, rather than the fee in the facilities themselves, and that such right, although a valuable property right, was not a capital asset within the meaning of the capital gains provisions. The right taken, said the Court, was not something in which the taxpayer had an investment separate and apart from its investment in the physical assets themselves.

We think that applying the doctrine of the above two Supreme Court cases to the transaction here involved requires us to hold that the income received by May during the years here involved is taxable as ordinary income rather than capital gain. True, we find that there was a transfer of May's equitable interest in the trust corpus but we can find no conversion of that interest for cash insofar as May was concerned. All she was receiving after the transaction was a part of the same income she was receiving prior to the transaction. It is a fact that after the transaction the State court found that Emil was entitled to the entire distributions from the trust and thereafter all distributions were made to Emil, but in reality May was simply receiving a lesser amount of the distribution from the trust than she had previously received and there was no sale or exchange of that right. This does not amount to a "capital transaction" within the meaning of the capital gains provisions of the Internal Revenue Code.

*Docket No. 91845—Gift Tax*

We believe it follows from the above discussion that the value of Emil's right to receive and retain 40 percent of the distributions of the trust and the value of the right to any terminal benefits which might inure to the owner of the life interest upon termination of trust, i.e., the accumulated income account and the claim to float and goodwill, which Emil received in this transaction was a gift from May to Emil in 1955. We can find no consideration passing from Emil to May for these rights. In our view of the transaction, Emil actually paid May nothing; she simply continued to receive 60 percent of the trust distributions. But if it should be found that Emil received from May the right to receive 100 percent of the trust distributions, and paid her 60 percent thereof as consideration for the transfer, we do not see how the consideration could be allocable to anything other than the right to receive 60 percent of the income of the trust. If such were the situation there would be no consideration allocable to the remaining 40-percent income interest and the terminal rights received by Emil.

The value of the consideration given by Emil would equal the value of 60 percent of the net income, and the value of the balance received by Emil would be deemed a gift.

Section 2512(b) of the Internal Revenue Code of 1954 provides in part as follows:

Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift * * *

Section 25.2512–8, Gift Tax Regs., provides in part as follows:

Transfers reached by the gift tax are not confined to those only which, being without a valuable consideration, accord with the common law concept of gifts, but embrace as well sales, exchanges, and other dispositions of property for a consideration to the extent that the value of the property transferred by the donor exceeds the value in money or money's worth of the consideration given therefor. * * *

Petitioners claim that this was not a taxable gift because the rights were obtained by Emil in an arm's-length transaction for a valuable consideration and that there was no donative intent on May's part.

While we find it difficult to believe that May had no donative intent with respect to this transaction, particularly in view of the fact that she appears to have ended up with considerably less than she had to start with, it seems clear that donative intent is not required to make a transfer taxable under the Federal gift tax laws. In *Commissioner* v. *Wemyss*, 324 U.S. 303 (1945), the Supreme Court stated:

For purposes of the gift tax it [Congress] not only dispensed with the test of "donative intent." It formulated a much more workable external test, that where "property is transferred for less than an adequate and full consideration in money or money's worth," the excess in such money value "shall for the purpose of the tax imposed by this title, be deemed a gift * * *." And Treasury Regulations have emphasized that common law considerations were not embodied in the gift tax.[1] [Footnote omitted.]

The only exception to the above well-established principle is in the case where there is a genuine business transaction involved. We cannot conclude from the evidence that this was a genuine business transaction between Emil and May negotiated at arm's length. It is obvious from the facts stated in our findings and from the evidence that there was a peculiar relationship existing between Emil and May even after their divorce and Emil's remarriage, that they were on quite friendly terms, that Emil continued to manage most of May's financial affairs, and that May was willing for Emil to have all of the benefits from the trust that she did not need or want for her own support and livelihood. Emil and May both testified that they were willing to be bound by the value arrived at by the accountant without making any estimates of the value of the life interest themselves. Yet the evidence indicates that Emil made considerable efforts to sell the life interest

to others soon after the transaction here involved was completed for a price considerably in excess of the value purportedly fixed by the accountant. May had no children and apparently no close relatives to whom she was particularly interested in leaving an estate on her death, and the value of any terminal rights in a trust which might accrue to the life beneficiary would be of little or no benefit to May but might be of considerable benefit to Emil if he survived her. The same might be said with respect to any unpaid balance of the purported $800,000 sales price at the time of May's death. May was to receive so much less of value to her personally than the present and potential value of what she transferred to Emil that one would have to be incredulous to believe that May expected to receive full and complete consideration for the actual value of the interests she transferred.

We therefore conclude that May made a taxable gift to Emil of the value of 40 percent of the distributions from the trust, plus the value of any terminal interests in the trust which might accrue to the owner of the life interest upon termination of the trust. Having found that Emil paid no consideration for this transfer, the value of the rights transferred would be the measure of the value of the gift subject to tax.

It would be impossible to determine with any exactitude what the value of the interest transferred to Emil was as of the date of the transfer. There are too many uncertainties, including, *inter alia*, May's life expectancy, the estimated profits of a competitive business, the amount of that profit or income which the trustee would feel required to put back into the business instead of distributing to the life beneficiary, the fact that if the trustee made distribution from the accrued income account during May's lifetime 60 percent thereof would be payable to May, and the uncertainty of who would be entitled to the float and goodwill of the business upon termination of the trust and the value thereof. We know of no mathematical formula which would take all these uncertainties into consideration but we must do the best we can on the evidence before us. *Hugh McK. Jones*, 29 T.C. 200 (1957).

Respondent determined the value of the gift of a 40-percent interest in the distributions from the trust and a 100-percent interest in the terminal rights to be $1,243,222 in his notice of deficiency. He started with a value for goodwill, plant, and equipment of Atlas, in the amount of $3,983,250, which he reduced by a factor based on May's life expectancy, to arrive at the value of the entire life interest ($1,530,454), of which he then took 40 percent. This amounted to $612,181. To this he added the then balance in the accumulated income account of $302,695, and a value for inventory and float presumably owned by the life tenant in the amount of $328,346, to arrive at the above total value of the gift. Petitioner offered little

evidence to rebut respondent's determination of value of the gift except medical testimony to the effect that because of her obesity and hypertension, May's subjective life expectancy was considerably less than the average life expectancy used in the tables based on age. Petitioners' evidence on this point is not convincing and is of course belied to some extent by the fact that May is still living about 8 years after the critical date.

Respondent's determination is presumptively correct. However, there is sufficient evidence in the record to indicate that some adjustments should be made in respondent's determination.

Respondent's formula for determining the value of the basic life interest (exclusive of any terminal rights) finds support in section 25.2512-5(c), Gift Tax Regs. However, there is no explanation that we can find anywhere in the record of how respondent arrived at his starting value for goodwill, plant, and equipment. The record does indicate that the book value of plant and equipment of the trust as of December 31, 1955, was considerably less than the total figure used by respondent. However, because of the presumption and for reasons hereinafter indicated, we will use respondent's figure as a starting point under the formula used in the regulation. Respondent used a factor based on the age of a life tenant of 61 years. It is agreed that May was 62 years of age on the date of this transaction. If we apply the factor for age 62 to respondent's starting value it results in a value for the life tenancy of $1,480,374.86, rather than $1,530,454 as determined by respondent. Forty percent of the corrected figure is $592,149.94, which would be the indicated value of the right to receive 40 percent of the distributions from the trust throughout May's normal life expectancy.

On the other hand if we determine the value of the right to receive 40 percent of the trust distributions during May's life expectancy by applying the average of the annual trust distributions during the 10-year period 1946-55 ($97,640) to the annuity table in paragraph (f) of the above regulations, which was about the method used by petitioners' accountant in determining the value of the life estate, we arrive at a value of $422,531 for the income interest. However, if we can use an average of the trust distributions over the preceding 5 years 1951-55 ($132,336) this method would produce a value of $562,089 for the income interest. This method is based, of course, on the amount of trust distributions rather than trust income. Inasmuch as any undistributed income would add to the accumulated income account, which the Ohio courts indicate the life tenant will eventually be entitled to, these figures may be low. In any event we conclude that there is not enough evidence in this record to overcome the presumptive correctness of respondent's value

for the 40-percent income interest, except that May's correct age should be used in the computation.[6]

Respondent added to the value of the income interest the agreed upon amount in the trust's accumulated income account at the time of the transaction ($302,695). It seems pretty clear from the opinion of the Ohio Supreme Court in the declaratory judgment action that the owner of the life interest will be entitled to the amount in this account upon termination of the trust, so this would be an additional item of value transferred to Emil. However, we do think this item should be discounted to some extent for the probable delay in receiving it.

Respondent also adds the sum of $328,346 as the value of inventory and float to which the life tenant will presumably be entitled upon termination of the trust. We have no explanation of how respondent arrived at this figure. There would seem to be considerable doubt whether the life tenant will be entitled to any part of the float and goodwill upon termination of the trust. In addition whatever value these doubtful rights might have as of the date of the transfer should also be discounted for the probable delay in receipt thereof. Consequently, we cannot attach too much value to this item in trying to determine a value for the interests transferred to Emil as a gift.

Taking all the above factors and the attendant uncertainties into consideration, in our judgment a fair market value for the 40-percent income interest and the terminal rights transferred by May to Emil as a gift would be $900,000, and we have so found as an ultimate fact. May's gift tax liability should be computed under Rule 50, using that figure as the value of the gift, and allowing the annual exclusion and her specific exemption as claimed in her petition.

## Addition to Gift Tax for Failure to File a Return

Respondent determined that May is liable for an addition to tax for failure to file a gift tax return for 1955 under section 6651, I.R.C. 1954.[7]

---

[6] We do not vouch for the accuracy of our computations above, but inasmuch as they are used for illustrative purposes only we believe they are sufficiently accurate for our purpose.

[7] SEC. 6651. FAILURE TO FILE TAX RETURN.

(a) ADDITION TO THE TAX.—In the case of failure to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), of subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.

May relied entirely on the advice of counsel concerning this entire transaction and upon the advice of her accountant with respect to the necessity for filing a gift tax return. It seems to us that under the facts and circumstances of this case both May and the accountant were justified in believing that the transaction could be considered a sale in toto, cf. *Estate of Michael Collino*, 25 T.C. 1026 (1956), and that the failure to file the gift tax return was due to reasonable cause and not due to willful neglect. We therefore conclude that no addition to tax is due from May.

### *Docket No. 93683—Emil's Income Tax*

The only issue in this docket number is whether Emil is entitled to amortize and deduct the entire 60 percent of the net trust distributions he paid over to May in 1956 and 1957. He reported the entire amounts distributed by the trust in each of those years as income.

Our conclusions on the above issues point to the conclusion that there is no deficiency in Emil's income tax for the years 1956 and 1957 resulting from deducting the amounts distributed to May in those years. In the first place we do not think he acquired the right to receive the 60 percent of the distributions from the trust which went to May for tax purposes. He was simply the conduit of that income from the trust to May and it was taxable to May, not Emil. In the second place if he did acquire the right to receive that income for tax purposes and it was taxable to him as ordinary income, we believe he would be entitled to amortize and deduct the entire amount paid to May in these years because the amount paid would be consideration for 60 percent of the entire distributions of the trust which he acquired from May, all of which is allocable to the cost of that wasting asset. *Bell* v. *Harrison*, 212 F. 2d 253 (1954).

> *Decisions will be entered under Rule 50 in docket Nos. 91844, 93682, and 91845.*
>
> *Decision will be entered for petitioners in docket No. 93683.*